STATE v. PAUL A. MILLER.

(Filed 7 January, 1942.)

**1. Automobiles § 29—**

Evidence *held* sufficient to support conviction of defendant on charge of drunken driving. C. S., 4506, as amended by Public Laws 1925, ch. 283; Public Laws 1927, ch. 230, sec. 1.

**2. Negligence § 23—**

Culpable negligence means something more than actionable negligence in the law of torts, and is such recklessness or carelessness, proximately resulting in injury or death, as imports a thoughtless disregard of consequence or heedless indifference to the safety and rights of others.

**3. Same—**

The violation of a safety statute which results in injury or death will constitute culpable negligence if the violation is willful, wanton, or intentional, or if the violation is inadvertent but is accompanied by a heedless disregard of probable consequences of a dangerous nature which could have been reasonably anticipated under the circumstances.

**4. Criminal Law §§ 32a, 52b—**

While circumstantial evidence is a recognized instrumentality in the ascertainment of truth, in order to sustain a conviction it must be such as to produce in the minds of the jurors a moral certainty of defendant's guilt and exclude any other reasonable hypothesis.

**5. Automobiles § 32e—Evidence held to leave in conjecture question of whether violation of safety statute was proximate cause of death.**

The State's evidence tended to show that defendant was operating his automobile while under the influence of intoxicating liquor, that his wife, who was riding in the front seat of the car with him, was also drunk, and that she was later found in the street near the curb with a fractured skull, which injury caused her death. The State's evidence further tended to show that although defendant's car was dilapidated, the right front door opened and closed all right, but a witness for defendant testified that the door was sprung and was hard to close so that it would catch tightly. There was further evidence for the State tending to show that at the scene where the wife was found there were tracks indicating that a car

had run over the curb, across a space reserved for sidewalk, and back into the street. Defendant testified that his wife attempted to jump out of the car, that he took both hands off the steering wheel in a futile effort to catch her, and at this time temporarily lost control of the car. There was evidence for defendant that when seen shortly before the accident he was not driving recklessly, and that prior thereto, while the car was stationary, his wife fell out of the car, or got out and fell on the sidewalk, without serious injury, and that defendant picked her up from where she lay and put her back in the car. *Held:* Whether the fatal injury to the wife was the proximate result of defendant's driving while under the influence of intoxicating liquor in violation of statute rests in mere speculation and conjecture upon the evidence considered in the light most favorable to the State, and defendant's motion to nonsuit upon the charge of manslaughter should have been allowed.

APPEAL by defendant from *Rousseau, J.,* at 5 May, 1941, Term, of FORSYTH.

Three criminal prosecutions upon (1) indictment charging defendant with crime of manslaughter of one Ruby Odessa Miller with deadly weapon, to wit, an automobile; (2) warrant charging defendant with crime of reckless driving of motor vehicle upon public highway; and (3) warrant charging defendant with operating motor vehicle on public highway while under the influence of intoxicating liquor, consolidated for the purpose of trial, to each of which defendant pleaded "Not guilty."

Upon the trial below the State offered evidence tending to show a narrative of facts leading up to and surrounding the death of Ruby Odessa Miller, wife of defendant, as same pertain to the offenses with which defendant is charged, substantially as follows: On the night of 5 April, 1941, about seven o'clock, Ruby Miller, wife of defendant, was found by Sergeant Mitchell of the State Highway Patrol, lying "face-foremost" unconscious on pavement on Broad Street, south of Salem Creek, in Winston-Salem, her feet "about twelve inches from the west curb and her head . . . something like three and a half feet" therefrom. She was lying in a pool of blood. She was admitted to hospital at seven o'clock and died in less than two hours thereafter, as result of "fractured skull with internal injuries to her brain."

An autopsy disclosed a fracture of the skull that extended from behind one ear across the top of the skull to behind the other ear. The temporal muscles on the left side of her head were full of hemorrhage. The brain showed severe damage. Externally there were various bruises and abrasions, some on the back of her hand, some on her knees, and some on her left hip.

On the afternoon of said date, Saturday, defendant, accompanied by his wife, his father and mother, a little boy, and one Luther Oxendine, having driven to Winston-Salem in his 1933 model V-8 Ford, parked at Sorrell's Warehouse around three o'clock, and all agreed to meet there at

six o'clock to "go back home." Defendant and his wife came to the meeting place ten or fifteen minutes after the others had arrived. It appeared that "he was drinking," though not drunk. "She seemed to be pretty high." As they came up she "was kind of staggering," and he "kind of holding her hand." While the others did not get in the car, defendant, his wife and Oxendine did do so—he driving, she sitting "in the middle" and Oxendine "on the outside." Oxendine testified: That they "come on out and hit First Street"; that defendant "was driving all right then," "but going down the hill from First to Brookstown" he "was going a little fast, and she was drunk and singing and laughing"; that as he, Oxendine, "told" defendant, "Paul, you had better not drive so fast coming down here," the wife of defendant said, "Don't drive so fast then—you might hurt somebody"; that while defendant "was driving fast" and "it wasn't reckless," he, Oxendine, was frightened, and decided to get out, because, in his language, "I knew if the law stopped us they would get us"; that upon Oxendine's request to stop and to let him out, defendant "put on the brakes" and Oxendine "pulled up the emergency brakes," and then "the car kind of ran over or against the side of the curb," attracting attention of W. R. Middleton, who was near-by; that Oxendine got out at the corner of First and Brookstown Streets around quarter to seven o'clock, and as he started to close the door, or slam it, defendant's wife "went over on the door." What followed immediately is detailed in testimony of W. R. Middleton, tending to show that he saw a man get out of a car, which the evidence tends to show was the car of defendant, slam the door and walk west on First Street, and next he saw a woman there "right across the sidewalk"; that she "seemed to be helpless" and "looked to be lifeless"; that a man got out of the car, "attempted to lift her back in" it; that when he got "her up a few inches, he stumbled and dropped her," but "succeeded in getting her back in the car"; and "got the door closed"; that then "she told him to leave her alone"; that then he started up First Street, which is steep there; that Middleton "did not see anything about that car while it was there, or as it left, to indicate any reckless driving," and, in his opinion, "when defendant turned south on Broad Street, he was making around thirty or thirty-five miles an hour."

Other testimony, offered by the State, tends to show that the scene of the above incident is approximately a mile and a half from the point where the wife of defendant was found on the street; and that about a block south of this point on Broad Street the car of defendant was seen traveling south with the door hanging open. The witness, Mrs. Gunter, testified: "It looked as if he might be trying to shut the door and going to turn around. He wasn't driving very fast. It looked like he might be going to make a complete turn or semi-circle. . . . He was driv-

ing slowly. . . . I think we were the only car going north and that was the only car I saw going south."

The State's evidence further tends to show that at the time patrolman drove up to where wife of defendant lay in the street, there was no other car or person there, but that in about five minutes afterward defendant came up driving a 1933 Ford coach, headed north, and parked on opposite side of street, and came over and identified the woman, but what he said was excluded; that he told the officers, who had gathered on the scene, "what had happened there" and "that he was driving the car sitting there"; (The officer, on cross-examination, would have testified that defendant said, "My wife jumped out of my car. I did all I could to prevent her jumping." Upon objection this was excluded. Exception.) and that defendant appeared to be under influence of some intoxicant, and the officer placed him under arrest.

The State's evidence further tended to show that it had rained some that afternoon and the street was wet or damp; that there were car tracks, indicating that, at a point just beyond the bridge on Broad Street, where there is no sidewalk, a car apparently traveling south had run a circular route across the space reserved for a sidewalk, on to "grassy bank" some ten feet from the curb, and then back into the street to the left of the pool of blood, in which wife of defendant was found.

The State's evidence further tended to show that the car in which defendant was riding was "old and shabby"—"a ram-shackle Ford" without brakes; that the door which, when opened, swings back two-thirds of the way, according to testimony of officers, opened and closed all right—nothing out of ordinary. But, on the contrary, according to witness Oxendine, the door where he got out "was hard to close," "looked like it had been bent up," "no glass" in it, and, further quoting him, "on that day I know that the car door was sprung . . . after it is once closed, it is hard to open, and if it is opened, it will fly open with a big noise."

On the other hand, defendant testified: That his wife "started to get out," after Oxendine had "started up the street," and fell down on the sidewalk; that he opened the door, went around, picked her up and put her in the car and shut the door; and then went around and "got under the wheel." Using his language, "I started on home . . . down Broad Street . . . toward the bottom of Broad, driving along about twenty-five miles an hour. Just before I got to the bridge, Ruby said she was going to jump out. I say, 'Honey, I wouldn't do that if I was you.' On the other side of the bridge, I looked over toward the Duke Power Company's plant. I heard the door crack and I looked around and Ruby was starting to jump out. I turned loose of the steering

wheel and tried to catch her, but I couldn't reach her. She said she was going to jump out . . . After she jumped out of the car . . . no faster than I was driving, I didn't think she was hurt very much. I went up to the next street to turn around and come back to get her. I come back and Mr. Mitchell was there. I got out and went over there and Mr. Mitchell said, 'I wouldn't touch her if I was you.' I says, 'I can't help it, it is my wife. She jumped out of the car.' I asked if he had called an ambulance and he said he had had it done."

On cross-examination defendant further testified: "I was trying to grab at my wife when we went over the bridge at Salem Creek and did not have my hands on the steering wheel, and don't know where it went. I was trying to catch her. I was so excited at that time I didn't know whether my car went up over the curb and come back in the road. She did not say to me . . . to stop and let her out . . . I did not tell the officers that my car went over the curb . . . I went up to the next street, turned and came back . . . to get her. There were cars coming down the street and I had to wait until they passed before I made my turn. I did not pass any cars but Mrs. Gunter's coming down that street before I came back . . . I wasn't running over twenty-five miles an hour when my wife jumped out of the car . . . My wife did not catch on the door when she jumped. She just leaped right out. I didn't stop right then because I was so excited and no faster than I was driving, I didn't think she was hurt much and I would go up and turn around and come back and get her."

Defendant further offered testimony tending to show that his wife was in highly nervous state and that on previous occasions she had threatened to jump out of cars in which she was riding.

Defendant further offered testimony tending to show that the right front door of defendant's car, which opened backward, would not open from the inside; no latch on inside; that "you would have to go around . . . or reach through the window and open it from the outside"; and that the door was closed "from the place Oxendine got out until she opened it and jumped out."

At the close of evidence for the State motion for judgment as in case of nonsuit as to the charge of reckless driving was allowed.

Verdict as to manslaughter: Guilty. Judgment: Confinement in State's Prison for a term of not less than four nor more than seven years, and assigned to such labor as is provided by law.

Verdict as to operating motor vehicle upon the highway while under the influence of intoxicating liquor: Guilty. Judgment: (a) Confinement in the common jail of Forsyth County for a period of two years, and assigned to work on the public highways under the control and supervision of the State Highway and Public Works Commission; (b)

surrender of his driver's license to the clerk of Superior Court; and (c) deprival of privilege of operating a motor vehicle upon the public highways for a period of two years.

Defendant appeals therefrom and assigns error.

*Attorney-General McMullan and Assistant Attorneys-General Bruton and Patton for the State.*

*J. F. Motsinger and E. M. Whitman for defendant, appellant.*

WINBORNE, J. Defendant challenges the judgment rendered in court below mainly upon the ground that the evidence, when taken in the light most favorable to the State, is insufficient to support either of the verdicts upon which it rests. While, after due consideration of exceptions pertaining thereto, we are of opinion that the evidence supports the verdict on the charge of operating a motor vehicle upon public highway while under the influence of intoxicating liquor, we are equally convinced that, accordant with applicable principles of law, well established in this State, the evidence, even when considered favorably alone to the State, leaves the proximate cause of the fatal injuries to deceased in a state of conjecture and speculation. *S. v. Cope,* 204 N. C., 28, 167 S. E., 456, and cases cited. In that case it is said that culpable negligence in the law of crimes is something more than actionable negligence in the law of torts. It is such recklessness or carelessness proximately resulting in injury or death, as imports a thoughtless disregard of consequences or a heedless indifference to the safety and rights of others. It may be in an intentional, willful or wanton violation of a statute or ordinance for the protection of human life or limb which proximately results in injury or death. Or it may be in an inadvertent violation of a prohibitory statute or ordinance accompanied by recklessness of probable consequences of a dangerous nature, when tested by the rule of reasonable prevision, amounting altogether to a thoughtless disregard of consequences or a heedless indifference to the safety of others, if injury or death proximately ensue.

While it is true as contended by the State that there is evidence that defendant at the time his wife was injured was violating the statute by which any person who shall, while intoxicated or under the influence of intoxicating liquors, operate a motor vehicle upon any public highway or street of any town in this State, shall be guilty of a misdemeanor. C. S., 4506, as amended by Public Laws 1925, chapter 283; Public Laws 1927, chapter 230, sec. 1. Yet, the State is forced to rely upon circumstances as to whether the violation of that statute proximately caused the fractured skull from which wife of defendant died. In this connection: "It is true that circumstantial evidence is not only a recog-

nized and accepted instrumentality in the ascertainment of truth, but also in many cases, quite essential to its establishment. . . . However, the rule is, that when the State relies upon circumstantial evidence for a conviction, the circumstances and evidence must be such as to produce in the mind of the jurors a moral certainty of the defendant's guilt, and exclude any other reasonable hypothesis." *S. v. Stiwinter,* 211 N. C., 278, 189 S. E., 868, and cases cited. See, also, *S. v. Madden,* 212 N. C., 56, 192 S. E., 859, where *Barnhill, J.,* fully discusses the subject. See, also, 23 C. J. S., 149, 150, 153.

Applying this principle to the evidence in hand, many theories consistent with logic and equally reasonable may be advanced as to what caused the wife of defendant to leave the car, which leaving, irrespective of how it may have occurred, manifestly inflicted the injuries which resulted in her death.

Conceding that the injuries were inflicted in leaving the car in some manner, it could be argued that if she were "drunk," "helpless" or "lifeless," she may have fallen "over on the door," which, if in a sprung condition, may not have been securely fastened, and might have opened, causing her to fall out of the car; or that, if drunk or if sober, she were leaning against the door, it might, because of its sprung condition, or for other unaccountable reason, have opened, and caused her to fall out; or that, there being no glass in the door, she may have put her hand through the door, taken hold of the handle to steady herself, and unintentionally turned it and caused the door to open; or that, under this last situation, she might have intentionally turned the handle and caused the door to open; or that, with her arm hanging on outside of door against the handle, the handle turned and the door opened; or that she deliberately opened the door and attempted to jump out and fell, or jumped and was thrown to the ground; or that, if the automobile tracks on outside of road were made by defendant's car, the car for lack of control, or for other cause, suddenly swerved in making the circular course, and threw her against the door, causing it to open; or that on such course, the car struck a bump and threw her through the glassless door. These theories, and many others which are conceivable, unless that of intentional jumping from the car be accepted, are based upon assumed facts, and are purely speculative and conjectural. A conviction, under such circumstances, runs counter to rights of defendant, and must not stand.

The judgment on verdict of guilty as to manslaughter is

Reversed.

The judgment on verdict of guilty as to operating motor vehicle on public highway, while under influence of intoxicating liquor, is

Affirmed.