STATE v. ELMER MATTHEWS and JIM COOK.

(Filed 29 March, 1950.)

**1. Criminal Law §§ 52a (7), 56—**

An instruction that the court grants a nonsuit on the offense charged in the indictment, followed by submission of the case on the question of defendants' guilt of a lesser degree of the offense charged, does not amount to a nonsuit on the indictment, G.S. 15-173, and perforce will not support a motion in arrest of judgment upon conviction of the lesser degree of the offense charged, G.S. 15-169.

**2. Criminal Law § 54e—**

Where the jury renders a verdict that defendants were guilty as aiders and abettors, the court has the power to give additional instructions, supported by the evidence, to the effect that persons aiding and abetting in the commission of the offense, all being present, are guilty of the offense, and to direct the jury to retire and reconsider, and to accept a proper verdict of guilty after such reconsideration by the jury.

**3. Assault § 8e—**

In order to constitute assault with a deadly weapon no special intent is required beyond the intent to commit the unlawful act, which will be inferred or presumed from the act itself.

**4. Criminal Law § 33—**

The admonition of the prosecuting witness after seeking out one defendant on his own initiative, "you had better come clean," *is held,* under

the circumstances of this case, not to render defendant's confession involuntary.

**5. Same—**

Where one defendant makes a voluntary confession and another defendant, without persuasion or inducement, admits the correctness of the statement in response to simple questioning, the confession is competent as against the second defendant.

**6. Same—**

The question of whether a confession is voluntary or involuntary must be determined upon the circumstances of each particular case.

DEFENDANTS' appeal from *Carr, J.,* October Term, 1949, EDGECOMBE Superior Court.

The defendants Matthews and Cook were tried on two bills of indictment consolidated in the trial because drawn upon the identical facts and considered as two counts in one indictment. The evidence was substantially as follows:

At the time of the occurrence a strike was in progress at the cotton mills located in the City of Tarboro, and the mills were being picketed by the strikers. J. D. Wyatt, a watchman who had been working inside the plant in that capacity during the strike, approached the gate of the mill for the purpose of entering for the discharge of his duties and found that he could not enter for the reason that the entrance was blocked by a mass of picketers. Jim Cook, one of the defendants and one of the strikers, was standing in front of the gate when Wyatt attempted to enter. When Wyatt parked his car Cook called to the "other boys" to come over and 50 or 60 came over from one of the picket tents and got across the gate. This was on Wednesday morning; the same day a restraining order was put into effect to prevent mass picketing. Wyatt observed, "Well looks like you all got it pretty well blocked this morning." Cook said that if Wyatt "went into that mill that morning or any other morning that the undertaker would have a job." Wyatt did not get to work that day nor the next day but returned to work Friday morning at 6 o'clock and that night "the shooting" constituting the assault occurred.

Wyatt as a witness states:

"One of the bullets went into the room I was sleeping in; it came through the wall that divides my room and Hathaway's room; it came about six feet from me. My wife and all the other occupants of my house had gone to bed when the shots were fired, and the lights were out. I am Jim Cook's uncle. The front room being used by Mr. Hathaway was a living room. We use it for both. Sometimes the girl slept in there and sometimes she did not. After

Hathaway's wife came out there it was being used as a bedroom. During the month of September she was with me. She's been out there near 'bout ever since the strike has been on. The bullet that entered my room went through a window in Hathaway's room and then into the room that I was sleeping in.

"The room in which I slept is behind the living room. My bed is located directly behind the bed Mr. Hathaway was sleeping in. There is a window next to my bed. Two windows behind the house. If a person were to go around my house and stand in front of one of those two windows he would be facing my bed.

"I will not say positively whether Jim Cook has been to my house since my daughter has been sleeping in the living room. Jim and his wife were both out there one morning and we went off on a fishing trip together, since the strike, but I don't recall whether it was before or not. I won't say as to whether he has been there since she has been sleeping in the living room. Before my daughter was there we used the living room a lots of times when we had company. The couch was located right near the window; it's been there ever since I moved there."

J. A. Everett, a member of the Tarboro police force, testified:

"I am a member of the Tarboro police force. On the night of the shooting Mr. Wyatt and Mr. Hathaway came to the police station. As a result of their appearance at the station I went out to make an investigation. Mr. Walton was with me. Hathaway went with me. I did not know where to go. Hathaway directed us to Hart Mill, the new settlement over there, to Jim Cooke's home. I went to Jim Cook's home. This rifle was delivered to me by his wife. Jim was not at home. I started back to the station and went by one of the picket tents and I saw Jim there and I stopped. I know Jim Cook. I called him over to the car. He got in. I told Jim that Sheriff Bardin was down at the station and would like to talk to him in regard to some shooting and I asked him would he mind going down to the station and he said, 'No.' So I said get in, and we went down to the police station. I asked him had he been shooting his rifle, and he said no, that he hadn't shot it in several months. He did not make any further statement about it at that time.

"On two occasions I was present when he talked to Sheriff Bardin at the police station that same night. Matthews was not present this first time Cook talked to the Sheriff. He made the statement that he loaned his rifle to Matthews and Brock.

"He said nothing else in my presence at that particular time. A few minutes later he did, but not then. Sheriff Bardin had a war-

rant issued for Matthews and Brock at that time, and then there was a conversation with Cook, and then later Cook's name was put on the warrant and due to the warrant we went to Matthews' house and arrested him. I was not with Matthews when he was brought back to the station. Matthews made a statement at the county jail. Cook and Sheriff Bardin was present.

"The Sheriff told Cook, said, 'Go ahead and tell what you told me awhile ago.' Then Cook said, 'I was in the front seat on the right-hand side of the car and Matthews was driving and Brock was in the back seat and done the shooting.' Cook made that statement. He said his rifle was used. The Sheriff said to Matthews, 'What do you say about it?' and he said, 'That's right. That's what he says.' Cook said they were in Matthews' car."

Tom Bardin, Sheriff, testified:

"I went to J. D. Wyatt's home the night of the shooting before I talked to the two defendants. I examined the premises." He then identified various objects in photographs introduced in evidence by the State, purporting to illustrate the interior of Wyatt's home after the shooting occurred, pointing out the bullet holes in the walls and windows, and identifying bullets removed therefrom. He further testified: "I knew where Mr. Wyatt lived before that time. The front window to the highway is not over 30 or 40 feet. Probably 15 yards at the most. That is from the shoulder. The concrete portion might be a little bit further, but not much. I first saw Jim Cook at the police station after I returned from Mr. Wyatt's house. . . . When we first arrived at the police station Cook was sitting in there and Mr. Wyatt went in the hall of the City Hall with him, and I went out a few minutes later where Mr. Wyatt and Jim Cook were, and Mr. Wyatt had been talking with him. . . . Mr. Wyatt was talking to him and said, 'Jim, we know it was you. You had better come clean.' I told Cook, 'Now, let me tell you before you make any statement anything you say can be used for you or against you.' . . . He then stated that yes, it was his gun, that Elmer Matthews and David Brock had come to his house and borrowed it from him and brought it back later. I asked him if he had cleaned the gun and he said no, when they brought it back it had been cleaned . . . I was not there when Mr. Wyatt was talking to Jim Cook."

During the examination the jury was sent from the courtroom and the following occurred: J. D. Wyatt (recalled) testified, in the absence of the jury: "As to what conversation I had with Cook and what statement I made to him before he made any statement to me, it was just what

Sheriff Bardin testified to. That is all that was said. I did not say I would do everything I could if he would come clean."

The jury returned and the court proceeded with the taking of testimony, Bardin still on the stand:

"Q. Did Cook tell you that he did go with them Sheriff?

"A. At this time he did not.

"Q. Well, tell me without reference to any names what he said happened when you first talked to him at the police station.

"A. He stated that two men came to his house and borrowed his rifle and said they were going to get Mr. Wyatt. Said they later brought back his rifle. Then I questioned him as to its being clean, and he said they must have cleaned it, that he did not clean it. And, as a result of that information that he gave me, I called for a Justice of the Peace to come down, and Mr. Wyatt swore out warrants for two other parties.

"Q. Did you thereafter have a warrant delivered to you for Elmer Matthews?

"A. Yes, sir. I served it. Matthews was at home. He had gone to bed. I read the warrant to him, and he got up and put his clothes on and got in the car. I believe it was my car." (At this point the court instructed the jury not to consider the following testimony as to defendant Jim Cook: "I asked him, 'What in the world were you all thinking about?' and he said, 'I don't know.' I said, 'You were with the boys, weren't you?' He said, 'Yes.' ")

"Q. As to the conversation with either Cook or Matthews, what happened next?

"A. Well, they were carried to the county jail, and all three of the defendants were in the hallway of the jail and I told Jim, 'All right, tell what happened.' Jim Cook, Elmer Matthews, Mr. Everett, Mr. Alderman, and the jailer were present. And I think another person came in before we were finished.

"Q. Did he call any names?

"A. They were all three together. He said they were all together and he stated, 'We went out to Mr. Wyatt's in Elmer Matthews' car and David Brock fired the bullets into the window.' I asked him, 'Whose gun was it?' and he said, 'It was my gun.' and he said it was Matthews' car, and I said, 'Who fired the bullets?' and he said, 'David Brock,' and I turned to Matthews and said, 'Is that right?' and he said, 'That's right.' I said, 'What did you say?' and he said, 'That's what he said.' "

"I examined the rifle that has been identified by Mr. Everett. It was freshly cleaned the night I examined it. I did not examine the magazine. I examined the chamber. There was fresh oil and burnt powder. I rubbed paper on it. That is the piece of paper that I used. Those markings are on there from wiping it. I rolled the paper up and rammed it up into the chamber. I brought it out and it was covered with fresh oil and burned powder. It is a .22-caliber rifle. It is an automatic. I don't know how many bullets it will hold. It will hold as many as five. I have examined the bullets closely enough to testify that they are .22 bullets. They are .22's. . . . The next day I was talking to Jim Cook and he made the statement that on the way out there to Wyatt's house one of the parties along was trying to find out if either one could shoot from the left shoulder, and neither one of them was left-handed, and since all of them shot from the right shoulder, they went down and turned around and came back and then shot into the house. He said he was seated on the front seat on the right-hand side. . . . Later on Matthews stated that he was driving the car and that he could not say who fired the gun. That David Brock and Jim Cook both were on the back seat and that the gun was fired from the back seat, but he did not know by whom. . . . Going from Tarboro to Wyatt's home the house would be on the right side of the road. I have known Mr. Wyatt three or four years. His general character and reputation is good. I have known Alton Hathaway personally just since this occurred. His general character and reputation is good." . . . "Later in the day, in questioning the boys, I asked them whether or not Howard Parker or Howard Harris had anything to do with it. I did not tell them I would let them go if they would tell what Harris or Parker had to do with it.

"In the conversation with Matthews and Cook, I told them they were in it and could not get out of it, but in my opinion they had been advised and that they were not fully responsible, and that I wanted to get whoever had been advising them before they got somebody else in trouble. I did not tell them that if they would talk I would go easy with them.

"In the course of questioning these boys I did not allow Mr. Wyatt to do part of the questioning. He was present right at the beginning. He was not present at any time after that. I don't recall that he did part of the questioning at the beginning. He and Cook went out in the hall and he talked to him for I wouldn't say over 60 seconds—a minute. And when I got there he made the statement to him, 'You had better come clean.'"

STATE *v.* MATTHEWS.

The State introduced in evidence the rifle mentioned in the testimony; paper identified as being used in rubbing oil and powder stains off the rifle; the bullets taken from the building. The State rested and each defendant moved for judgment of nonsuit, which was declined, and each of them excepted.

The defendants then moved for a verdict of not guilty as to the charge of a secret assault, and the motion was denied. Defendants objected. Each defendant moved "for judgment of nonsuit as to the charge of felonious secret assault." The motion was denied. Defendants object to the following instruction to the jury, the exceptive matter included in parenthesis:

> ("The statute under which this indictment was drawn, requiring the State to prove that there was not only an assault made in a secret manner with intent to kill, but that there was likewise a battery, and battery meaning the application of some force to the person of the one assaulted in law, the Court being of the opinion that in this case there is not sufficient evidence of a battery as to any of the occupants of the dwelling of Mr. Wyatt to justify the case being sent to the jury and considered by the jury on the charge of the secret assault with intent to kill, the Court has granted the motion for nonsuit on the charge of the felonious assault (1) and will submit to the jury the question of guilt or innocence of the defendants on the charge of an assault with a deadly weapon upon Barbara Jean Hathaway, Alton Hathaway and Ola Mae Hathaway, the occupants of the room into which it is alleged the shots that have been referred to in the evidence were fired.")

The evidence was submitted to the jury and after deliberation the jury returned and the following occurred:

> "Upon the coming in of the jury the Clerk inquired of the jury if they had agreed upon a verdict, and the foreman, speaking for the jury, replied, 'Yes.' The Clerk then inquired, 'How say you, do you find the defendant Elmer Matthews guilty or not guilty?' 'To which the foreman of the jury replied, 'Guilty.' The Clerk then inquired, 'Do you find the defendant Jim Cook guilty or not guilty?' and the jury replied, 'Guilty,' and the Clerk then said, 'So say you all?' and the jury replied, 'Yes.' The Court then made inquiry of the jury in the following language: 'Do you find the defendants guilty of an assault with a deadly weapon?' to which the foreman of the jury replied. 'Yes. Guilty of aiding and abetting.'"

Thereupon the court gave to the jury the following instruction, to which the defendants filed exception:

"Gentlemen, the Court again instructs you that an aider and abettor in the commission of the crime of an assault with a deadly weapon, if he be present and actively by overt acts, aids and abets the one who commits the crime is guilty of the offense of an assault with a deadly weapon, that is to say, that aiders and abettors in misdemeanors are guilty as principals and the Court again instructs you that if the State has satisfied the jury beyond a reasonable doubt that the defendants were present at the time a third person by the name of Brock committed an assault with a deadly weapon upon the occupants of the front room in said home of the witness Wyatt, to wit, Barbara Jean Hathaway, Alton Hathaway and Ola Mae Hathaway, and the State has further satisfied you beyond a reasonable doubt that the said Brock did intentionally shoot rifle bullets into the bedroom of the said Barbara Jean Hathaway, Alton Hathaway and Ola Mae Hathaway in the nighttime while the said Barbara Jean Hathaway, Alton Hathaway and Ola Mae Hathaway were occupying said bedroom, and that the said Brock fired said bullets into said bedroom in a manner that was likely to cause injury to the occupants of said room or any of them and in the manner so as to cause them or any of them to have to move from a place where they had a right to be as a result of being frightened from such shooting and has further satisfied you beyond a reasonable doubt that the defendants were present and actively aiding and abetting the said Brock in the commission of said offense, that is in the commission of the shooting of the rifle bullets which the Court has just referred to, then and in that event it would be your duty to return a verdict of guilty of assault with a deadly weapon as to each of said defendants.

"If the State has failed to so satisfy you of those facts beyond a reasonable doubt, it would be your duty to return a verdict of not guilty, and the Court again instructs you that you may return a verdict of guilty of assault with a deadly weapon as to both of the defendants, or you may return a verdict of guilty of assault with a deadly weapon as to either of them and not guilty as to the other, or you may return a verdict of not guilty as to both of them, depending upon how you find the facts to be."

The jury retired for further deliberation. The defendants moved that they be discharged on the basis of the verdict just brought in by the jury

and the motion was declined. Defendants excepted. The jury returned to the courtroom and the following occurred:

"The Clerk inquired of the jury as follows: 'Gentlemen have you agreed upon the verdict?' Whereupon the foreman answered, 'Yes.' And the Clerk inquired: 'Do you find the defendant Elmer Matthews guilty or not guilty?' Whereupon the foreman answered: 'Guilty.' 'Do you find the defendant Jim Cook guilty or not guilty?' Whereupon the foreman answered: 'Guilty.' The Court then inquired: 'Do you find the defendant Elmer Matthews guilty of assault with a deadly weapon or not guilty?' Whereupon the foreman replied: 'Guilty.' The Court inquired of the jury: 'Do you find the defendant Jim Cook guilty of assault with a deadly weapon or not guilty?' Whereupon the foreman replied: 'Guilty.' "

The defendants renewed their motion for discharge, which was denied, and defendants excepted.

Defendants then moved that the verdict be set aside and this was declined. They then moved that a mistrial be declared and that they be allowed a new trial. Motion denied, and defendants excepted. The defendants each moved in arrest of judgment. The motion was denied, and the defendants excepted.

Judgment thereupon followed the verdict, assigning to each defendant, Elmer Matthews and Jim Cook, two years confinement in jail to work under the supervision of the State Highway and Public Works Commission. Each defendant objected, and excepted, and appealed.

*Attorney-General McMullan and Assistant Attorney-General Bruton for the State.*

*Robert S. Cahoon for defendants, appellants.*

SEAWELL, J. The record on appeal is voluminous and contains a multitude of exceptions. These required and have received careful consideration but space forbids elaboration here.

The phases of the trial most stressed in the appellants' brief and oral argument, and in which they find the more serious challenge to its validity, will be discussed.

1. The theory that defendants were entitled to a discharge as upon acquittal as grounded in the motions in arrest of judgment and similar motions affecting the verdict, has neither technical nor substantial merit. The theory is that there was only one charge against them,—that of felonious secret assault,—and the manner in which the court dealt with

it had the effect of nonsuiting the State thereon, which, under the statute operates as an acquittal, G.S. 15-173.

Consonant with the practice here we regard the effect of the action taken by the court as simply withdrawing from the consideration of the jury the more aggravating and more serious elements of the offense charged, leaving to their consideration the lesser crime or degree of the offense. This, within the frame of the case presented, was favorable to the defendants, and certainly within the law and approved practice. Without it, it would still have been competent for the jury to convict the defendants of a lesser degree of crime charged. G.S. 15-169, 170; *S. v. Jackson*, 199 N.C. 321, 154 S.E. 402; *S. v. Williams*, 185 N.C. 685, 116 S.E. 736; *S. v. High*, 215 N.C. 244, 1 S.E. 2d 563; *S. v. Jones*, 222 N.C. 37, 38, 21 S.E. 2d 812; *S. v. Bentley*, 223 N.C. 563, 27 S.E. 2d 738; *S. v. Weinstein*, 224 N.C. 645, 31 S.E. 2d 920; *S. v. Oxendine*, 224 N.C. 825, 32 S.E. 2d 648.

The withdrawal of the more aggravated charge from consideration by the jury and submission of the less aggravated phase of the offense was within the discretion of the trial judge.

Closely parallel with the foregoing subject was the exception taken to the fact that the trial judge did not receive the verdict of the jury as first tendered, in response to the formal question of the court as to how they had found. In it they found both defendants guilty, answering, "Yes, guilty of aiding and abetting," but the judge sent the jury back for further deliberation after further instructing them as to the significance of aiding and abetting while present.

The answer to this objection may be found in *S. v. Perry*, 225 N.C. 174, 33 S.E. 2d 869, loc. cit., 176:

> "When, and only when, an incomplete, imperfect, insensible, or repugnant verdict or a verdict which is not responsive to the issues or indictment is returned, the court may decline to accept it and direct the jury to retire, reconsider the matter, and bring in a proper verdict. *S. v. Arrington*, 7 N.C. 571; *S. v. McKay*, 150 N.C. 813, 63 S.E. 1059; *S. v. Bazemore, supra* (193 N.C. 336); *S. v. Noland*, 204 N.C. 329, 168 S.E. 412; *Queen v. DeHart*, 209 N.C. 414, 184 S.E. 7."

See also *S. v. Wilson*, 218 N.C. 556, 11 S.E. 2d 567.

The conclusion to which the jury had come was not materially changed by their further consideration. *S. v. Forshee*, 228 N.C. 268, 45 S.E. 2d 372; *S. v. Thompson*, 227 N.C. 19, 40 S.E. 2d 620.

The instruction given was called for by the evidence that tended to show that the defendants acted in concert. *S. v. Gibson*, 226 N.C. 194,

37 S.E. 2d 316; among other things accommodating the person chosen to do the shooting by jockeying the car so that upon its return the shot could be fired out of the right window by a right-handed person.

Defendants were tried for an assault with a deadly weapon and no special evidence was required beyond the intent to commit the unlawful act, and this will be inferred or presumed from the act itself. 1 McClain's Criminal Law, secs. 239, 240.

2. The appellants urge that the confessions made by these defendants were involuntary and should have been denied admission in evidence. There is no suggestion that either of them was coerced, threatened, subjected to torture, physical or mental, worn down by repeated questioning, or otherwise mistreated in order to produce a confession as the purchase price of surcease from pain or weariness. The contention is that there was some implied promise, or at least hope held out in the conversation between Wyatt and Cook that the defendant would be treated more leniently. Wyatt had said, "Jim, we know it was you. You had better come clean." There was no further inducement.

As careful as this Court has always been to see that incriminating statements made by persons accused of crime are in fact and in deed voluntary before admitting them in evidence, free from the influence of promise or undue persuasion, and fully recognizing that necessity, we are unable to class the remarks made by Wyatt to his nephew Cook in any of the objectionable categories.

The evidence discloses that Wyatt went to talk with Cook on his own initiative without any evidence that he went, as contended by appellants, with official procurement. He does not appear to have been an emissary, stooge or *agent provocateur* of the officials. However, the sheriff was present during part of the conversation and this must be given due consideration. The sheriff also warned him that what he said could be used as evidence for him or against him, and this warning, while not required in this State, (*S. v. Dixon,* 215 N.C. 438, 2 S.E. 2d 371; *S. v. Grier,* 203 N.C. 586, 166 S.E. 595), has been uniformly considered as bearing on the voluntariness of the statement.

Matthews, when first arrested was asked by Sheriff Bardin: "What in the world were you thinking about?" And Matthews replied, "I don't know." The sheriff then said, "You were with the boys, weren't you?" And Matthews replied, "Yes."

Later, at the jail, all three of the defendants being present, Cook was asked to tell what happened and gave a detailed account of the affair, stating that "we went out to Mr. Wyatt's house in Elmer Matthews' car and David Brock fired the bullets." Matthews, upon a simple question by the sheriff, admitted the correctness of the statement. Later on Matthews stated that he was driving the car and Brock and Cook were

in the back seat; that the gun was fired from the back seat but that he did not know who fired it. Since Matthews, without persuasion or inducement, admitted the correctness of Cook's statement, he was not privy to any constitutional immunity which counsel for appellants can claim for Cook; and his objection to the admission of the evidence is untenable.

The card-index method of determining the case before us would be a poor substitute for reason, and a sense of justice both to the public and the men accused of crime. The Court is always happy to find and follow well reasoned precedent, but must in each instance be guided by its own reason and sense of right on a study of the facts before it, since, because of their infinite variety, every case must stand on its own bottom. In appraising the significance of the interchange between Wyatt and Cook, supposed to have elicited the self-incriminating statement, it is logical to assume that the reaction is normal to the stimulus; emotionally responsive to the appeal. There is nothing in Wyatt's exhortation to "come clean" that should incite fear or inspire hope in the normal mind, —neither threat nor promise. It appears to be an appeal to conscience, which every person, not completely amoral, has in some degree; or to that indefinable urge to square himself with the truth which experience has shown is often an incentive to confession in the most abandoned.

The subject is one of repeated occurrence in our Reports and the following cases will be found apposite to the decision: *S. v. Thompson, supra; S. v. Litteral,* 227 N.C. 527, 43 S.E. 2d 84; *S. v. Grass,* 223 N.C. 31, 25 S.E. 2d 193; *S. v. Oxendine, supra; S. v. Caldwell,* 212 N.C. 484, 193 S.E. 716; *S. v. Bohannon,* 142 N.C. 695, 55 S.E. 797; *S. v. Moore,* 210 N.C. 686, 188 S.E. 421; *S. v. Myers,* 202 N.C. 351, 162 S.E. 764; *S. v. Harrison,* 115 N.C. 706, 20 S.E. 175.

In the *Thompson case, supra,* will be found a critical and comprehensive analysis of the whole subject, with pointed analogy to the instant case; in that case the Court held: that a statement to a defendant, "it would be better to go on and tell us the truth than try to lie about it . . .; it would be better to come on and tell the truth," did not amount to a threat or promise. The expression used by Wyatt, of like character and import, but much milder in expression, did not contain either threat or promise affecting the voluntariness of his confession.

We have not thought it necessary to note all the exceptions to the evidence in the foregoing statement of the case in the order in which they were made, but have given the defendants the benefit of every one of them as made in our study and consideration of the case and do not find prejudicial error. The court below was careful to distinguish where the evidence was competent against one of the defendants and not against the other, and so instructed the jury. And we do not find in this phase of the exceptions any reason to interfere with the result of the trial.

Objections to the instructions given the jury not here noted have also been carefully examined and we do not find them meritorious.

We find no error in the trial.

No error.