## STATE v. RICHARD PAUL R. KLUCKHOHN.

(Filed 13 January, 1956.)

**1. Criminal Law § 52a (1)—**

Upon motion to nonsuit, the evidence must be considered in the light most favorable to the State, giving the State the benefit of every reasonable inference that may be drawn therefrom.

**2. Criminal Law § 52a (2)—**

If there is any competent evidence to support the charge contained in the bill of indictment, the case must be submitted to the jury.

**3. Homicide §§ 8a, 25—**

Evidence tending to show that defendant was handling his pistol in his hotel room, and fired same through the window, fatally injuring a person in a parking lot below, is sufficient to be submitted to the jury on the issue of defendant's culpable negligence in a prosecution for manslaughter, notwithstanding testimony that defendant did not know the gun was loaded and did not consciously point it at anyone.

**4. Homicide §§ 8a, 27e—**

Where there is no evidence that defendant intentionally pointed his pistol at anyone, G.S. 14-34 does not apply, and an instruction that the violation of the statute, proximately resulting in injury and death, would constitute manslaughter, must be *held* for error. The State's evidence of a statement by defendant to the effect that he was "dry firing" the pistol does not amount to evidence that defendant intentionally pointed the weapon at deceased, though it is competent upon the question of culpable negligence.

**5. Criminal Law § 53d—**

The failure of the court to state the law applicable to defendant's evidence in explanation of incriminating facts adduced by the State must be *held* for prejudicial error.

**6. Homicide § 27e—**

Where, in a prosecution for manslaughter, defendant relies upon misadventure or accident, an instruction to the effect that where a person does a lawful act in a careful and lawful manner and without any unlawful intent, resulting in death, the homicide is excusable, but that the absence of any of these elements would involve guilt, is erroneous, since a mere negligent departure from the rule given would not necessarily constitute culpable negligence.

**7. Criminal Law §§ 53f, 53k—**

Where the court gives the State's contentions on every phase of the testimony in detail, but gives the defendant's contentions only in brief and general terms, even though defendant had offered voluminous evidence in explanation of incriminating circumstances adduced by the State, the charge must be *held* prejudicial. G.S. 1-180.

BARNHILL, C. J., dissenting.
PARKER, J., concurring in dissent.

APPEAL by defendant from *Williams, J.,* June Term, 1955, of WAKE.

Criminal prosecution tried upon a bill of indictment charging the defendant with the murder of one Miss Bernice Seawell. The bill of indictment charged murder in the first degree; however, when the defendant was arraigned and entered a plea of not guilty, the solicitor for the State announced that he would not seek a conviction of murder in the first degree but would ask for a verdict of guilty of murder in the second degree, or manslaughter, as the evidence might warrant.

At the conclusion of all the evidence, a motion for judgment as of nonsuit was allowed as to the charge of murder in the second degree but overruled as to the charge of manslaughter.

The evidence tends to show that Richard Paul Kluckhohn, aged 21, was employed as a manuscript solicitor and sales representative in the College Department of the publishing firm of Rowe, Peterson and Company of Evanston, Illinois, and for several weeks prior to 13 May, 1955, he had been traveling through the Southern states visiting colleges and universities in connection with his employer's business. On 11 May, 1955, he arrived in Raleigh, North Carolina, and registered at the Sir Walter Hotel and was assigned to Room 214. During the time he was in the hotel, he was principally engaged in familiarizing himself with one of the books of his company which he was selling, and for diversion he was cleaning his camera and his Luger pistol, and reading fiction. He had purchased the Luger pistol only a short time before at Urbana, Illinois, and had never fired it. During the morning of 13 May, 1955, the defendant testified he had worked on the Luger pistol, running several rounds through the gun, had removed the ammunition clip, and had, he thought, unloaded the gun before placing it on the bed nearest the window. The gun was seen in the room on the bureau on 12 May, 1955, and on the bed on 13 May, 1955, by the hotel maid and housekeeper.

The defendant's evidence further tends to show that, after lunch on 13 May, he placed most of his clothing and toilet articles in his bags, and after reading awhile, prepared to leave the hotel to keep an engagement for the weekend with Dr. Joseph A. Kahl in Chapel Hill, North Carolina. Standing between the two beds, he picked up the pistol to take it apart, and as he was bringing the pistol up, he snapped the trigger and it went off. He testified that he was not consciously pointing the gun anywhere; that he thought it was unloaded; that the noise from the report was loud, causing his ears to ring and dazing him. That he dropped the gun on the bed, sat down briefly, then picked up the

gun, disassembled it, cleaned the barrel with a cleaning patch, put the parts of the gun in his bag, gathered his baggage and left the room. That he was afraid the hotel people had heard the noise and he would get in trouble with them. That he did not know where the bullet had gone or that anyone was hurt.

Leaving the room he went to the lobby and to the cashier's window, where he asked for the bill for Room 214. That he did not appear to the cashier to be nervous or upset or in a hurry. When he offered to pay his bill with a check, he was informed that it would be necessary to have it approved by Mr. Morgan, the Assistant Manager. He crossed the lobby to Mr. Morgan's desk, showed Mr. Morgan his identification card with his name and address and that of his employer's on it, and secured Mr. Morgan's approval on his personal check. The Assistant Manager discussed with him the housekeeper's report about the pistol in his room, and talked with him about Luger pistols and ammunition for them. According to Mr. Morgan, he appeared perfectly normal. The defendant went from Mr. Morgan's desk back to the cashier's window, paid his bill with the check, receipting on the back of the check for the cash he had received.

He left the hotel, got his car and drove to Glen Lennox near Chapel Hill, on Highway 54, where he left some clothes to be cleaned to be picked up the following Monday afternoon. He drove around the University campus and to Dr. Kahl's apartment at 36 Hales Road in Glen Lennox.

Shortly after 6:00 p.m., an officer of the Chapel Hill police force called at Dr. Kahl's apartment and asked for the defendant. The officer asked the defendant if he had a pistol and if it had been fired in Raleigh that day, which the defendant acknowledged, and the officer informed the defendant that a lady had been killed. The defendant exclaimed, "Oh, my God!" and put his hands to his face. The officer testified that the defendant then told him that he had taken down the gun and was dry firing when the gun went off, but that he did not know he had killed anybody, and that he did not know the gun was loaded. The defendant and Dr. Kahl testified that the term "dry firing" was never used. The defendant went with the officer, got his bag with the disassembled Luger pistol in it and turned it over to the officer and was taken to the Chapel Hill Police Station to await the arrival of the Raleigh police officers.

Room 214 in the Sir Walter Hotel is on the fourth floor above Salisbury Street and directly above the sidewalk. The Sir Walter Hotel is on the southeast corner of South Salisbury Street and West Davie Street in the City of Raleigh, and McLaurin Parking Lot is on the southwest corner of Salisbury and Davie Streets. A few minutes before 3:00

o'clock in the afternoon on 13 May, 1955, Mr. Harold McLaurin drove the car owned by Mrs. J. H. Patterson from another part of the parking lot east on Davie Street and turned south on Salisbury Street, stopping with the front of the car approximately ten yards south of the intersection. It was raining pretty hard. Mrs. Patterson and her sister, Miss Bernice Seawell, were waiting in the middle of the lot under an umbrella, and when the car came around the corner, they started across the lot towards the car. Mrs. Patterson gave Miss Seawell the umbrella, and Miss Seawell went to get in on the side nearest the sidewalk. Mrs. Patterson went around the front of the car to pay the attendant and get in on the driver's side. Mr. McLaurin heard a report and ran around the car to Miss Seawell, who was staggering. Miss Seawell was standing approximately eight yards south of the intersection. An ambulance and the police were called and arrived within a few minutes. She was taken to the hospital where she was examined by a physician who testified that there was a bullet wound with the point of entrance on her right shoulder and the point of exit on the left side about the eighth rib, and that she died as a result of that wound.

There was evidence offered that the police cars and the ambulance used sirens and that a crowd gathered at the place where the deceased fell. There was also evidence offered that nothing unusual was heard in the hotel. Three police officers testified that after the ambulance left they saw the defendant looking down on the scene from the room identified as No. 214, and identified the defendant in the courtroom. A witness for the defendant testified that, at about the same time referred to by the police officers, he had examined the windows on the western side of the hotel and he had seen no one. There was no evidence that the defendant knew Miss Seawell, the deceased.

The jury returned a verdict of manslaughter, and from the sentence imposed the defendant appeals, assigning error.

*Attorney-General Rodman and Assistant Attorney-General Love for the State.*

*Manning & Fulton and John L. Sanders for defendant.*

DENNY, J. The record in this case contains approximately 255 pages of evidence adduced in the trial below; the State's evidence consists of 146 pages and that of the defendant 109. Consequently, we have set out herein only such portions thereof as we deem necessary to an understanding of the questions presented for our consideration and determination.

The defendant entered 560 exceptions in the trial below, including those challenging the correctness of the charge. The record contains

36 assignments of error based on numerous exceptions.  However, only 32 of these exceptions are discussed in the brief.  The remaining ones will be deemed abandoned under Rule 28 of the Rules of Practice in the Supreme Court, 221 N.C. 562.

The first assignment of error is directed to the failure of the court to sustain the defendant's motion for judgment as of nonsuit as to the charge of manslaughter, and for a directed verdict of not guilty.

It is well settled in this jurisdiction that in passing upon a motion for judgment as of nonsuit in a criminal prosecution, we must consider the evidence in the light most favorable to the State, and if there is any competent evidence to support the charge contained in the bill of indictment, the case is one for the jury.  *S. v. Ritter,* 239 N.C. 89, 79 S.E. 2d 164; *S. v. Church,* 231 N.C. 39, 55 S.E. 2d 792; *S. v. Gentry,* 228 N.C. 643, 46 S.E. 2d 863; *S. v. Scoggins,* 225 N.C. 71, 33 S.E. 2d 473.  Furthermore, in the consideration of such motion, the State is entitled to the benefit of every reasonable inference that may be drawn from the evidence.  *S. v. Ritter, supra; S. v. Gentry, supra.*  Applying the rule as laid down in our decisions with respect to such motions, we think the State's evidence in the trial below was sufficient to carry the case to the jury, and we so hold.  Therefore, this assignment of error is overruled.

The defendant excepts and assigns as error the following portion of the charge: "The State contends that you should find the defendant guilty of manslaughter for that he violated a statute on the statute books which reads as follows: "If a (any) person shall point any gun or pistol at any person, either in fun or otherwise, whether such gun or pistol be loaded or not (loaded), he shall be guilty of an assault, and upon conviction of the same shall be fined, imprisoned, or both, at the discretion of the court.  (G.S. 14-34.)  I instruct you, gentlemen, that a violation of that statute proximately resulting in injury and death would constitute manslaughter."

The defendant insists that there is no evidence to show that he intentionally pointed his gun at the deceased, and that the evidence as to "dry firing" was not sufficient to show a violation of the above statute. There is no evidence in the record tending to show that the defendant intentionally pointed his gun at the deceased and then fired, unless the evidence with respect to "dry firing" was sufficient to support the State's contention in that respect.  The Chapel Hill police officer testified that when he talked with the defendant in the apartment of Dr. Kahl, around 6:00 p.m. on 13 May, 1955, that the defendant said, "I had taken the gun down and was dry firing it."  The State offered evidence to the effect that "dry firing" is a term or terminology classifying a certain use of a firearm; that "dry firing" is the aiming of a weapon at any given object and lining up the sights on some object and then squeezing the

trigger. This evidence may be considered on the question of culpable negligence, but in our opinion it is not sufficient to support the State's contention that the defendant intentionally pointed his pistol at the deceased and then pulled the trigger, and we so hold. Even so, the case should be submitted to the jury on proper instructions for its determination as to whether or not the death of the deceased was proximately caused by the culpable negligence of the defendant. *S. v. Limerick,* 146 N.C. 649, 61 S.E. 568; *S. v. Turnage,* 138 N.C. 566, 49 S.E. 913; *S. v. Trollinger,* 162 N.C. 618, 77 S.E. 957; *S. v. Stansell,* 203 N.C. 69, 164 S.E. 580.

In the case of *S. v. Turnage, supra,* the defendant had been convicted of involuntary manslaughter. The evidence tended to show that John Turnage, the defendant, threw a brickbat at Blaney Turnage who was in a peach tree. Thereafter, the defendant John Turnage, Dan Moore, Sam Moore, James Hunt and Blaney Turnage went into the Turnage back yard. The defendant went around the house and Blaney Turnage, his brother, followed him with an axe. The defendant went in the house and came out with a gun in his hands, with the muzzle in the direction of the deceased and his companions. Dan Moore, a witness for the State, testified that he could not say "how high the gun was up, or whether to the prisoner's shoulder or not; that he heard the gun fire when the prisoner was 12 feet from the deceased." James Hunt was hit and killed by the shot. The defendant testified, "When I got the gun I did not know it was loaded—had no knowledge of it. After shooting, I learned that the gun had been loaded; did not intentionally point the gun at anyone. . . . I got the gun to frolic with Blaney." Evidence was introduced to the effect that ordinarily the gun was not loaded. Among other instructions, the court charged the jury that upon all the evidence in the case, if believed beyond a reasonable doubt, the prisoner was guilty of manslaughter at least. This Court said: "We do not mean to intimate that there was not sufficient evidence to go to the jury, but we think the guilt or innocence of the prisoner should have been submitted to the jury upon all the evidence, with full and appropriate instructions as to what constitutes manslaughter, as the State asks for no other verdict, and presenting to the jury the contentions of the State and prisoner upon the evidence."

Likewise, in *S. v. Limerick, supra,* the evidence was to the effect that two young boys, the best of friends, had a gun and started through a straw field. A witness for the State testified that the prisoner and the deceased were scuffling over the gun. "One of the boys said, 'I will shoot you.' I don't know which it was. The other said, 'No, you won't; I will shoot you.' . . . I turned around and saw the gun fire, and deceased fell. Prisoner had gun when deceased fell." The deceased said

before he died that the shooting was an accident. The trial judge charged the jury that if they believed the evidence they should find the defendant guilty of manslaughter at least; that, taking all the evidence in its most favorable light to the defendant, he would be guilty of manslaughter. The jury returned a verdict of guilty of manslaughter. This Court, in awarding a new trial, said: "Undoubtedly, if the prisoner intentionally pointed the gun at the deceased and it was then discharged, inflicting the wound of which he died, or if the prisoner was at the time guilty of culpable negligence in the way he handled and dealt with the gun, and by reason of such negligence the gun was discharged, causing the death of deceased, in either event the prisoner would be guilty of manslaughter, and this whether the discharge of the gun was intentional or accidental . . . But neither of these positions necessarily or as a matter of law arises from the testimony, and the question of the prisoner's guilt or innocence must be left for the jury to determine on the facts as they shall find them. *S. v. Turnage.*"

In *S. v. Trollinger, supra,* the deceased was killed by the discharge of a pistol in the hands of the defendant and under circumstances as follows: A group of persons, seven in number, in which the deceased and the defendant were included, were talking and laughing. A witness for the State testified that he was from five to ten feet behind the group and heard a shot, and heard a person named Trollinger (not the defendant) say: "You shot that boy!" and heard the defendant say, "I never shot the boy." That he caught up with the crowd and found Nash Lane shot. The witness never saw the pistol. The court directed a verdict of guilty of manslaughter. This Court, in giving a new trial, said: "It is not admitted nor has it thus far been established that the prisoner intentionally pointed the pistol towards the deceased, and the testimony as now given in seems to present the prisoner's case on the question whether he was guilty of culpable negligence in the way he was handling the weapon at the time of its discharge. Negligence of a kind not unlikely to cause injury to the deceased or any of the bystanders; and a proper application of the principles announced in *Limerick's case* requires that the issue be submitted to the jury as to defendant's guilt or innocence of the crime of manslaughter. See *S. v. Turnage,* 138 N.C. 566."

The defendant also assigns as error the failure of the court to give the pertinent contentions arising on his evidence with respect to "dry firing," flight, character evidence, and other pertinent matters, and its further failure to declare and explain the law applicable to his contentions as to what occurred, if the jury should find his version of what occurred to be true. *Mallard v. Mallard,* 234 N.C. 654, 68 S.E. 2d 247; *S. v. Sherian,* 234 N.C. 30, 65 S.E. 2d 331; *S. v. Ardrey,* 232 N.C. 721,

62 S.E. 2d 53; *S. v. Herbin,* 232 N.C. 318, 59 S.E. 2d 635; *S. v. Sutton,* 230 N.C. 244, 52 S.E. 2d 921. This assignment of error is well taken and will be upheld.

The defendant likewise assigns as error the following portion of the charge directed to the defendant's plea of misadventure or accident: "The defendant having entered a plea of Not Guilty, contends that the killing was through misadventure or accident and the Court instructs you that where one does a lawful act in a careful and lawful manner and without any unlawful intent, accidentally kills, that is excusable homicide, but these facts must all appear and the absence of any one of these elements will involve guilt. Accident is an event that happens unexpectedly and without fault."

The vice in this instruction is that it leaves the jury free to consider ordinary rather than culpable negligence as sufficient to make unavailing to the defendant the plea of accidental killing. *S. v. Early,* 232 N.C. 717, 62 S.E. 2d 84; *S. v. Wooten,* 228 N.C. 628, 46 S.E. 2d 868; *S. v. Miller,* 220 N.C. 660, 18 S.E. 2d 143; *S. v. Cope,* 204 N.C. 28, 167 S.E. 456. A mere negligent departure from the conduct referred to in the challenged portion of the charge would not necessarily involve or constitute criminal guilt. A departure to be criminal would have to consist of an intentional, willful, or wanton violation of a statute or ordinance enacted for the protection of human life or limb which resulted in injury or death. Such a violation of a statute would constitute culpable negligence. *S. v. Cope, supra.* "Culpable negligence in the law of crimes is something more than actionable negligence in the law of torts. *S. v. Stansell,* 203 N.C. 69, 164 S.E. 580; *S. v. Rountree,* 181 N.C. 535, 106 S.E. 669. Culpable negligence is such recklessness or carelessness, proximately resulting in injury or death, as imports a thoughtless disregard of consequences or a heedless indifference to the safety and rights of others. . . . But, an unintentional violation of a prohibitory statute or ordinance, unaccompanied by recklessness or probable consequences of a dangerous nature, when tested by the rule of reasonable prevision, is not such negligence as imports criminal responsibility." *S. v. Cope, supra.*

The defendant further assigns as error the failure of the court to give equal stress to the contentions of the State and the defendant as required by G.S. 1-180. We think this assignment of error is also well taken and must be sustained. We have repeatedly held that a trial judge is not required by law to state the contentions of litigants to the jury. *Brannon v. Ellis,* 240 N.C. 81, 81 S.E. 2d 196; *S. v. Colson,* 222 N.C. 28, 21 S.E. 2d 808; *Trust Co. v. Insurance Co.,* 204 N.C. 282, 167 S.E. 854. When, however, a judge undertakes to state the contentions of one party, he must also give the equally pertinent contentions of the

opposing party.  *S. v. Colson, supra.*  The equal stress which the statute requires to be given to contentions of the State and the defendant, in a criminal action, does not mean that the statement of contentions of the State and of the defendant must be equal in length.  *S. v. Jessup*, 219 N.C. 620, 14 S.E. 2d 668.  For instance, in a trial where the evidence for the defendant is short, or where he may have chosen not to offer any evidence at all, his contentions will naturally be very few in contrast with those of the State where it may have introduced a great volume of testimony.  *Brannon v. Ellis, supra.*

In the charge under consideration, the court gave the State's contentions on every phase of the testimony at great length and in detail.  On the other hand, the court gave the defendant's contentions in very brief, general terms, as though he had offered no evidence at all.  The pertinent contentions arising from the defendant's evidence were not given as required by the provisions of G.S. 1-180 as interpreted and applied in our decisions.

A careful examination of the charge also reveals that nowhere in it did the court instruct the jury that if the State had failed to show beyond a reasonable doubt that the defendant was guilty, it would return a verdict of not guilty, or that, if the jury should fail to find the defendant guilty beyond a reasonable doubt, it would be its duty to return a verdict of not guilty.

For the reasons stated, the defendant is entitled to a new trial and it is so ordered.

There are other exceptions appearing on the record worthy of consideration, but since they are not likely to occur on another trial, we will not discuss them now.

New trial.

BARNHILL, C. J., dissenting:  When the evidence in this case is boiled down to its essentials, the facts are few, and all point in one direction. Viewing the evidence offered by the defendant himself, the facts are simple and the inferences to be drawn therefrom are impelling and, in my opinion, lead to only one reasonable conclusion.

A pistol is a deadly weapon.  It is so dangerous that the General Assembly has made it a crime for a person to point one at another, even "in fun or otherwise."  G.S. 14-34.  The defendant was carrying one with him on his travels, prompted no doubt by an ill-conceived idea he needed it for protection.  He took it out of his baggage, and it was seen once on the bureau in his room and again on his bed.  So it is quite apparent he had been handling it.

On the occasion of the homicide he took it in his hand and pulled the trigger without taking care to ascertain whether it was loaded—though

this is a fact he must have known—or giving thought to the direction in which it was pointed. After it was fired, he callously failed to make any effort to determine in what direction the bullet had gone or where it had landed. It might have passed through the door into the hall where some person was passing, or it might have gone through a wall into another room occupied by other guests of the hotel, or it might have—as it did—passed through the window and mortally wounded one of those who were passing along the west sidewalk of Salisbury Street, or landed in the adjoining parking lot where people were passing to and fro. But what did he care! He calmly finished packing, went to the lobby, paid his bill, chatted for a while with one of the officers of the hotel, and departed, concerned only as to whether anyone had heard the pistol fire in his room.

This is the case made out by defendant's own testimony. The State made out, at least *prima facie*, a much stronger case against him. Under the evidence for the State he stood at the window and watched the people gather around the woman he had mortally wounded.

It makes no difference exactly where defendant was standing when he fired the shot. The irrefutable physical evidence discloses that he was so situated that if he pointed the pistol downward at a somewhat acute angle and fired it, the bullet would strike on or near the sidewalk of Salisbury Street or in the automobile parking lot. It was so pointed, and the bullet did strike the deceased who was on the sidewalk, preparing to get into an automobile.

To my mind this testimony, for which defendant vouches, evidences a culpably heedless use of a deadly weapon resulting in the death of deceased which entitled the State to a peremptory instruction, so that any error in the charge was harmless.

"Where one engaged in an unlawful and dangerous act, such as 'fooling with an old gun,' *i.e.*, using a loaded pistol in a careless and reckless manner, or pointing it at another, and kills the other by accident, he would be guilty of an unlawful homicide or manslaughter. G.S. 14-34; *S. v. Vines*, 93 N.C. 493; *S. v. Trollinger*, 162 N.C. 618, 77 S.E. 957; *S. v. Limerick*, 146 N.C. 649, 61 S.E. 568." *S. v. Hovis*, 233 N.C. 359, 64 S.E. 2d 564.

I might add that the cause was tried on the theory the State was required to prove that the defendant intentionally pointed the pistol toward the street where people were passing back and forth. Such is not the case. If defendant intentionally pointed the pistol toward the street and then fired it, inflicting a fatal wound on one of the pedestrians, he would be guilty of murder in the second degree. Thus, in some respects, the charge was more favorable to defendant than he had any right to expect. In any event, a person is presumed to intend the

natural consequences of his act. *S. v. Matthews,* 231 N.C. 617, 58 S.E. 2d 625.

Let me add that if the homicide had been accomplished with any instrumentality other than a deadly weapon I would concur in the majority opinion. The facts being what they are, I must vote to affirm.

PARKER, J., concurs in dissent.