## STATE v. CLAUDE NEEDHAM.

(Filed 21 May, 1952.)

**1. Criminal Law § 52a (3)—**

While circumstantial evidence is an accepted instrumentality in the ascertainment of truth, it must establish facts so connected and related as to point unerringly to defendant's guilt and exclude any other reasonable hypothesis in order to withstand defendant's motion to nonsuit, and when the facts are consistent with innocence and raise a mere inference or conjecture or possibility of guilt, nonsuit should be entered.

**2. Criminal Law § 51—**

While the weight and credibility of circumstantial evidence, as well as whether the facts in evidence are so connected or related as to exclude every reasonable hypothesis of innocence, are all questions of fact for the jury, it is for the court to determine in the first instance whether the evidence considered in the light most favorable to the State is of sufficient probative force to justify the jury in drawing the affirmative inference of guilt.

**3. Arson § 7: Homicide § 25—Circumstantial evidence of defendant's guilt of arson and murder held insufficient for jury.**

The State's evidence tended to show that defendant and the wife of deceased had carried on illicit relations over a period of years to the knowledge of the husband, but that the parties remained on good terms except at times when they were drinking, and that defendant and deceased seemed friendly on the day in question. The evidence further tended to show that the three of them, in company with three others, engaged in a drinking party at deceased's residence until at least all of them but defendant and deceased went to sleep, that one of them was later awakened by some noise and saw a man standing in the kitchen with a lighted stick or pine knot, cursing, whereupon the witness ran from the house, awoke one of his companions on the front porch and stated that another companion (not the defendant) was trying to burn up the house, and that defendant was seen driving his car on the highway away from the scene at a rapid rate on a circuitous route about the time of the fire. Deceased's body was found in the house after the fire. *Held:* Conceding that the evidence was sufficient to show the fire was of incendiary origin, it raises only a conjecture or suspicion as to defendant's identity as the incendiary, and defendant's motion to nonsuit should have been allowed upon the prosecutions

for arson and murder, the facts in evidence being consistent with defendant's version of the occurrences and being consistent with his innocence.

**4. Arson § 7—**

The State's evidence tending to show that defendant and deceased's wife had carried on illicit relations over a period of years, that defendant was displeased when deceased and his wife moved to a place some distance from defendant's residence, and stated that a good way to get them to move would be to burn the house, but that the statement was made some three or four years before the fire in question and that deceased and his wife had thereafter twice moved, *is held* of little probative force on the question of the identity of defendant as the incendiary of the house in which the parties last resided.

**5. Same—**

Evidence that oil was found in the well and burned chips and paper found in the kitchen at the home of the deceased, without any evidence tending to connect defendant therewith, is without probative force on the question of defendant's identity as the incendiary.

**6. Same—**

Evidence of illicit relations between defendant and deceased's wife is without probative force on the question of defendant's identity as the incendiary of the fire in which deceased was burned to death when the evidence further shows that though deceased knew of the relations between his wife and defendant, he and defendant nevertheless remained in harmonious and friendly relations, and there is no evidence of a plan or scheme on the part of defendant to burn the house.

APPEAL by defendant from *Rudisill, J.,* and a jury, January Term, 1952, of STOKES.

Criminal prosecutions tried upon two bills of indictment, consolidated for trial, charging the defendant with arson and murder in the first degree.

The theory of the alleged dual crimes is that the defendant (1) by willfully and feloniously burning a tenant house occupied by James O. Lawson thereby committed the crime of arson, and (2) that the further crime of murder in the first degree was consummated when Lawson was burned to death in the house. (G.S. 14-17 as amended.) The fire occurred Sunday afternoon, 26 August, 1951.

The jury returned a verdict of guilty as to each charge, with recommendation of life imprisonment. Thereupon judgment was entered in each case directing that the defendant "be confined in the State's Prison at hard labor for the remainder of his natural life."

The defendant appealed, assigning errors.

*Attorney-General McMullan, Assistant Attorney-General Moody, and Charles G. Powell, Jr., Member of Staff, for the State.*

*Woltz & Barber and Folger & Folger for defendant, appellant.*

JOHNSON, J.   The crucial exception presented by this appeal tests the sufficiency of the evidence to carry the case to the jury over the defendant's motions for judgment as of nonsuit, made in apt time under the provisions of G.S. 15-173.

The gist of the State's case as gleaned from the testimony of the witnesses called by the Solicitor is in substance as follows:

For eight years or more the defendant, father of nine children, had been engaged in illicit relations with the wife of the deceased, mother of four children.   The defendant began visiting the Lawson home when the family lived on the Napier farm about four miles from Pilot Mountain. About 1943 the Lawson family moved to the Jim Hill place, which adjoins the defendant's farm.   It was then that the association between the defendant and the deceased's wife became more intimate and ·constant. The wife of the deceased testified she started having intercourse with the defendant two or three months after the family moved to the Hill place. She said: "I got to know Mr. Needham when he kept coming there and all drinking together.   Sometimes he furnished the liquor and sometimes my husband."   The family stayed at the Hill place three years, and then moved to the Carson place where they remained a year.   Mrs. Lawson said the defendant came to see her three or four times a week while she and the family were living at the Hill and Carson places.

From the Carson place the family moved to Sid Johnson's at Germanton in Stokes County, a distance of some 20 miles from Needham's home. The wife of the deceased testified Needham "didn't like us moving to the Johnson place because it was too far," but he "came about every week-end and sometimes during the week. . . . He wanted us to move to the Boyles place near where he lived. . . . He said a good way to get us out would be to burn the house to get us away from down there. . . ."

After one year at the Johnson place the family moved to the "mountain at Pinnacle" about 1948.   (Distance from defendant's home not given.) The deceased's wife said the defendant kept coming "to see us about the same as when we lived at the other places," but he "wanted us to move to the Boyles place."

The family made the last move in January, 1951,—this time to the Nelson place, where the fire occurred.   Needham continued to visit the Lawson home "two or three times a week" down to the time of the fatal event.

The evidence discloses that during all this time the deceased knew about the illicit relations between his wife and the defendant.   She testified: "My husband knew about the relationship between Needham and me." The deceased and the defendant appeared to be on friendly terms, except at times when they were drinking.   On such occasions they quarreled, threatened each other and slapped each other, but as the wife put it, there

was "no serious injury." Needham frequently brought liquor and some-times groceries. "He kinda wanted to be boss."

The tenant house on the Nelson place in which the Lawsons lived was located 300 or 400 feet west of State Highway No. 66 in Stokes County. There was a "front yard or driveway going all the way from the highway to the house. . . . nothing to interfere with . . . view of the house from the highway," except a pack house located between the highway and the house. ". . . woods extend close to the north side of the house and out near the highway. There are two tobacco barns located across the road ·(highway) from the house. . . . There was a well behind the house very close to the house . . . The woods behind the house were about 50 feet from the well . . ."

The house "was a five room, one-story frame house. . . . Approaching the house from the front there were three bedrooms on the right-hand side, and on the left-hand side there was a living room or front room, and the kitchen was directly behind the front room. There was no hall in the house. There were two outside doors. One entering from the front porch into the front room and the other from the kitchen out onto the back porch." There was no outside door leading from the back bedroom. To get out of that bedroom it was necessary to go through the kitchen. "There were three doors in the kitchen—one opening into the west bed-room, one outdoors, and one into the front room."

Only the two younger Lawson children, a girl 16 and a boy 10, were living with the family, and both were visiting away from home the Sunday afternoon of the fire.

The defendant came to the Lawson home the Saturday before the fire. Lawson's wife testified: "He came in a blue Ford . . . about 3 o'clock. . . . He brought about a quart of liquor in a half gallon can. . . . We were curing tobacco at the barn . . . across the road. . . . We all lay behind the barn on a quilt."

Early the next morning the three rode off in Needham's car to get whiskey and groceries. They returned about 8 o'clock with a quart of whiskey, some groceries, and a half gallon of kerosene oil. Needham's car was left parked in the yard near the pack house. Mrs. Lawson had built a fire in the stove to cook breakfast and it was still burning when they returned. They started drinking early.

Later in the morning Walter Inman, Curt Shelton and Claude Gordon arrived on the scene.

Inman testified the three of them went to the Lawson place in Gordon's pick-up truck, taking about half a gallon of whiskey. They arrived around 10 or 11 o'clock. Inman said: ". . . I was drinking right smart. The three of us went into the house taking liquor with us. We found Claude Needham and Mr. and Mrs. Lawson there . . . setting in the

kitchen at the table. I started passing around the liquor. . . . I drank about a cup full of liquor, and was drunk and went in the front room and went to sleep . . . on the floor beside the couch." Later "some kind of noise woke me up. I jumped up and turned around, couldn't think where I was. I had been pretty drunk, and whirled around to leave when I saw a whole lot of smoke and a little fire in the kitchen. I saw a man through the smoke in the kitchen standing up with something in his hand and heard him say, 'G— damn, G— damn.' I don't know whether it was a stick, or pine knot or what it was in his hand, but it was on fire and he started cursing and then he turned and his arms obstructed a view of his face. I couldn't tell how far in the kitchen the man was. I don't remember who it was or what size man it was but he was cursing and I thought he was trying to burn the house up and I left there. I ran out the front door and into Curt Shelton who was setting in the swing in the front porch. I told him Claude Gordon was trying to burn the house up." Then, according to Inman, both men ran around the side of the house, Shelton tried to get in the house at the back, and then both men ran off into the woods, where they remained 15 or 20 minutes while the house burned. Inman further said: "When I went out the front door and saw Curt Shelton (in the swing) . . . I didn't see nobody else in front of the house. I didn't see any automobile in the yard at the house. . . . When I went out the door and started around to the right, I didn't see nobody leave the house and didn't see nobody going in the direction of the road and the tobacco barn. . . ."

Curt Shelton testified he went to the Lawson home with Inman and Claude Gordon; that he carried there about three pints of liquor in a half gallon jar and put it on the table in the kitchen where Mr. and Mrs. Lawson and the defendant Needham were sitting around the table eating. He said they all continued to drink, and after a while he left the kitchen and went to the swing on the porch and went to sleep. He said: "I figured I was drunk, and don't know what time that was. The last time I saw Needham, he was in the kitchen and Mr. and Mrs. Lawson went out to the well and was drinking water. I was asleep (in the swing) when Inman woke me up. . . . I was not conscious from the time I lay down there until awakened by Inman. . . . I saw smoke all around the eaves of the house. . . . I started to go in the front door and saw an awful smoke and went around to the back where I saw the first blaze in the kitchen. I was not able to go in. I was too drunk. I heard Mr. Lawson in there calling sort of low. I knew his voice, hollering, 'Oh, Lordy, help me.' I couldn't understand him. I heard it at the kitchen window. . . . The voice sounded close to the window. . . . I don't know whether Mr. Lawson was drunk or not the last time I saw him in the kitchen. . . ." Then after failing to get in the kitchen, Shelton said he and Inman

went on to the woods and stayed there probably 10 or 15 minutes before returning to the house. He said Needham's 49 blue Ford was parked in the yard in front of the house when he arrived that morning. "When Inman woke me up, if the car was there I didn't pay any attention to it." Shelton further said that earlier that day he had trouble with Gordon and Gordon left.

Claude Gordon testified he went to the Lawson home with Shelton and Inman, but stayed there only about an hour. He said: "Curt (Shelton) smacked me and I got in my truck and left. . . . I got home ten to twelve and didn't go back over there any more that day."

The wife of the deceased testified that sometime during the morning she left the kitchen. "When I got drunk I usually left the house and lay down and went to sleep." On this occasion she said she went back below the house and lay down. "I don't remember where . . . or how long I was there. I don't remember who was at the house when I left. It seems to me the best I remember Claude (Needham) had left." When she waked up and arrived at the house, it was in flames.

The defendant was arrested about midnight after the fire. He was found at his home asleep at a tobacco barn. He appeared to be sober. He "didn't seem to be excited" when arrested. He admitted he was over at Lawsons that afternoon. When asked what time he left, he hesitated at first,—"said he didn't have any time and didn't know. . . . He finally said he left there about 4 o'clock." He was then interrogated about his route home from the Lawson place, and the evidence tends to show "it would be five miles nearer by Old Rock House to Pilot Mountain than the way he took."

One of the officers testified the defendant stated to him that sometime in the afternoon "he moved his car from the pack house up across the hard surface road behind the tobacco barn, and . . . lay down on a pallet and went to sleep, where he and Mr. Lawson slept the night before, and when he got up he looked towards the house and saw Shelton in the swing on the porch, and then . . . got in his car and left and said nothing to nobody. . . . He saw no fire at that time. . . . There wasn't any smoke at the house at all at that time. He said he didn't know the house was on fire until he was arrested . . ."

Will Hicks testified he passed the Lawson place on the highway twice the afternoon of the fire. The first time, around 2:30 or 3, he saw a car parked behind the barn across the road. It looked like a black car, but he couldn't tell what kind. When he came back about 4, the same car was there at the barn. He saw no one about the barn or car either time he passed. About 30 minutes after he last passed, he saw smoke—white at first then later black—and on investigation found the Lawson house on fire.

G. Willis Burrell testified he passed the Lawson place about 3:35 the afternoon in question and saw Mr. Lawson coming out of the barn. "He bent over like he was mending the fire and he raised on up. I have seen him often before, sometimes three or four times a day passing by there. The barn is not but about 10 feet from the road. Mr. Lawson did not seem to be drunk. I didn't see anyone else around the barn. I saw a car behind the barn, a blue looking Ford, don't know what model but seemed like a 49 or 50. I went straight on home (about a mile and a half) . . . and (later) saw smoke. . . . about 30 or 40 minutes after I passed. . . . We went to the fire.

Mrs. Vance Jones testified she and her husband came by the Lawson place the afternoon in question "sometime before 4 or 5 o'clock." My husband was driving and no one else was with us. I saw a man cross the road and go between the barns. He came straight across the road from the one that goes to the Lawson home. I didn't know who it was and he was some distance away. He had on a white looking shirt and a blue hat. He was as far away from me as the distance between the two barns and was traveling afoot pretty fast. (One witness said the barns were "farther apart than 100 feet," another said "it is about 75 yards between the two . . . barns). . . . I don't have any idea who the man was. . . . I didn't see anything or anybody at the barn and didn't notice whether there was a car there or not." After reaching home 10 or 15 minutes later, she saw smoke and on investigation found the Lawson home was on fire.

Vance Jones testified that as he and his wife drove by on the way home he "saw a sorter blue looking Ford sitting behind the tobacco barn. . . . I did not see a man cross the road near the Lawsons or near the tobacco barn. My wife later told me that she had seen a man cross the road. We went on to the house and down to our tobacco barn. After we had been there awhile we saw smoke. . . . It was about 10 or 15 minutes after we had turned into our house." As he drove on to the Lawson house, he said, "I didn't see the automobile sitting behind the barn when I returned."

Mrs. Johnny Boles testified she lives about a quarter of a mile north of the Lawson's, "right on the side of the road," and that she had seen him (Needham) passing three or four times a week since the Lawsons moved to the Nelson place. She said on this afternoon "I saw Mr. Needham going north toward Sam Simmons' service station. I didn't see anybody in the car with him. About thirty minutes after I saw him pass . . . I saw smoke in the direction of the Lawson house. . . . when we got there the house was beginning to fall in."

Jack Roberts testified he lives south of the Lawson place—a mile and a half from the Lawsons on a dirt road about a quarter of a mile off Highway No. 66, and was curing tobacco at his barn on the Sunday afternoon of the fire. He said he saw some smoke between 4 and 5 o'clock and

started to the Lawson home and "met Claude Needham in a blue Ford. He was traveling pretty fast, about 40 or 45 miles an hour. . . . He was going south towards the gap of the mountain. It was about a mile and a quarter from where I met Needham to the Lawson home. . . ."

The defendant told the officers he went home by way of Pilot Mountain Inn, where he stopped and got a sandwich. Officer Christian testified the defendant could have gone either by Sam Simmons' or the Rock House Church Road; that the distance from the Lawson home to Pilot Mountain Inn by the Church Road is 9.6 miles, by Mount Olive and Chestnut Grove it is 17.4½. Officer Christian said the defendant told the officers that night "he went to Mt. Olive Church and by Chestnut Grove Church and on to 52 at Dalton and on up to Pilot Mountain Inn. Sheriff Johnson testified: "I guess it would be five miles nearer by the Old Rock House to Pilot Mountain than the way he took." But "at that time they were working on this road and grading it."

The evidence also tends to show traveling south on Highway No. 66, the way the defendant allegedly went home, a dirt road leads off from the highway "about a quarter of a mile below the Lawson house and circles around and comes back to the same highway on what is known as the Gap Mountain. . . . The road was a bumpy dirt road." The witness Jack Roberts lives on this road. Over this road the distance from the Lawson's to the Gap was half a mile farther than the direct route down Highway No. 66.

Officer Christian further said that the night the defendant was arrested he "denied he took the dirt road." But ". . . next day when I talked to him he told me he took the dirt road that (the) Roberts boy lived on and come out over at the Gap." Needham also told this witness he had on "a light shirt with a black dot in it," the day of the fire.

M. M. Gordon testified he was returning to his home near Pilot Mountain from Hanging Rock by way of the Rock House Church Road. "After we saw the smoke a dark looking car went by that was a Ford. This was about 300 or 400 yards from the Lawson place. The car was going pretty fast. We stopped at the fire and . . . saw a couple of men in the yard and the couple crossed the yard and stepped up on the porch and it looked like they were looking in the window. . . . and when we got about half way down to the house they stepped off of the porch and went to the left of the house and I never saw any more of them. I don't know whether that was Curt Shelton and Inman or not. As we started around the corner of the house we heard a voice behind the house and as I got around the right-hand corner a man went through the woods and I turned and went to the left and turned to the window and heard a voice. The two men we saw on the porch when we started went to the left-hand side facing the road. I saw the other man on the right-hand side and didn't know

any of them. I heard a man's voice in the house but could not distinguish anything he said. He was kinder groaning and puffing. . . . I didn't see Curt Shelton and Inman around there and I know them. . . . I got there before Vance Jones did. . . . The man I saw went off to the right, north. That wasn't in the direction of the road but was going back from the road. The man went off towards the back of the house in the opposite direction from where the tobacco barns across the road are. The automobile I met was 400 yards down the road before I saw someone running off. . . . The other man I saw went to the right down to the woods. . . . (he) had on a dark colored shirt. . . . I was about 50 yards or something like that from the men I saw. . . ."

Curt Shelton, recalled, testified: "That me and Inman went around to the left south side of the house. . . . I left there with Inman and we went around the house together. We went to the woods together. I don't know whether he was in front or behind."

John J. Coon testified he passed the Lawson place about 4:30 the Sunday afternoon in question. He said: "I saw Mr. Gordon and we walked down from the road together. There were just two people there ahead of us and I didn't know them. . . . I don't know that it was Shelton and Inman. They went around the house south, heading west. . . . They went together . . . into the woods . . . . I didn't see anything more of them. . . . The first blaze I saw was in the northwest corner. I heard a groaning, inside the house. . . . We pulled the screen off and raised the window and Mr. Gordon shoved me up into it but when we did this smoke came over and closed it up. . . . but (I) still couldn't make it. . . . I later saw the Jones boy and he made an attempt to get in the house. . . . The only men I saw were the two that went around the south side of the house."

Deputy Sheriff Christian testified he went to the Lawson place after the fire was about over. A few people were still there. "They had just got the body out. . . . There was just a stub they had in a small tin tub."

He also said he went to the Lawson home the next day and found "cooking utensils and pans setting on the stove lids. All doors were closed and the lids on."

Over the defendant's objection, Mrs. Lawson and her daughter were permitted to testify that while the family lived at the Carson place they found under the kitchen safe some chips and paper that appeared to have been partly burned. And witnesses also were permitted to testify over objection that oil was found in the well once after the family moved to the Nelson place. However, there was no evidence tending to show when or by whom or under what circumstances the oil was put in the well or the chips and paper were placed under the safe. And there was no further evidence of explanation tending to connect the defendant with either event.

It thus appears that the State's case as developed in the court below rests almost entirely upon circumstantial evidence. Such evidence when properly understood and applied is a recognized and accepted instrumentality in the ascertainment of truth. *S. v. Holland,* 234 N.C. 354, p. 358, 67 S.E. 2d 272.

However, where circumstantial evidence is relied on to convict as in the instant case, the rule is, as stated by *Stacy, C. J.,* in *S. v. Harvey,* 228 N.C. 62, p. 64, 44 S.E. 2d 472 : "that the facts established or adduced on the hearing must be of such a nature and so connected or related as to point unerringly to the defendant's guilt and to exclude any other reasonable hypothesis." See also *S. v. Stiwinter,* 211 N.C. 278, 189 S.E. 868; *S. v. Matthews,* 66 N.C. 106; *S. v. Holland, supra.*

"Moreover, the guilt of a person charged with the commission of a crime is not to be inferred merely from facts consistent with his guilt. They must be inconsistent with his innocence." *S. v. Webb,* 233 N.C. 382, top p. 387, 64 S.E. 2d 268. See also *S. v. Harvey, supra; S. v. Murphy,* 225 N.C. 115, 33 S.E. 2d 588.

"Evidence which merely shows it possible for the fact in issue to be as alleged, or which raises a mere conjecture that it was so, is an insufficient foundation for a verdict and should not be left to the jury." *S. v. Webb, supra,* quoting from *S. v. Vinson,* 63 N.C. 335. See also *S. v. Johnson,* 199 N.C. 429, 154 S.E. 730; *S. v. Boyd,* 223 N.C. 79, 25 S.E. 2d 456; *S. v. Murphy, supra; S. v. Palmer,* 230 N.C. 205, 52 S.E. 2d 908.

True, in cases wherein the State must rely on circumstantial evidence for conviction, it is for the jury to determine the weight and credit, if any, to be given the facts shown in evidence and the inference to be drawn therefrom. Therefore, the question whether the facts shown in evidence are so connected or related as to exclude every reasonable hypothesis of innocence and point unerringly to the guilt of the accused involves questions of fact to be resolved by deduction and inference of the jury. However, on motion for nonsuit, it is a question of law for the court to determine, in the first instance, whether the evidence adduced, when considered in its light most favorable to the State, is of sufficient probative force to justify the jury in drawing the affirmative inference of guilt. See *S. v. Madden,* 212 N.C. 56, 192 S.E. 859; *S. v. Jones,* 215 N.C. 660, 2 S.E. 2d 867; *S. v. Miller,* 220 N.C. 660, 18 S.E. 2d 143; *S. v. Alston,* 233 N.C. 341, 64 S.E. 2d 3; *S. v. Massengill,* 228 N.C. 612, 46 S.E. 2d 713; Stansbury, N. C. Evidence, Sec. 210, pp. 453 and 454.

It may be conceded that the testimony of Inman, when taken as true and considered in its light most favorable to the State, is sufficient to support the inference that the fire was of incendiary origin. But it does not follow therefrom that Needham was the incendiary. Inman in his testimony neither identified the man he saw in the kitchen with the stick

of fire, nor described him as resembling the defendant. In fact, the record discloses that after Inman saw the man in the kitchen he rushed out to the swing on the porch, awakened his friend Shelton, and "told him Claude Gordon was trying to burn the house up."

Thus we are at grips with the question of identity—the question whether the evidence in its over-all aspects is sufficient to show presence at the scene and opportunity of the defendant to commit the alleged crimes. Here the State points to the evidence tending to show the defendant's car was seen parked near the tobacco barn before the fire and that it was not seen there after the fire was discovered and that people along the road saw him driving in the opposite direction about the time the smoke from the fire was first seen.

However, this line of evidence seems to be entirely consistent with the defendant's statement made to the officers. He told them he left the drinking party at the house earlier that day, moved his car from the yard to the tobacco barn, lay down and went to sleep on the pallet at the barn; that he awoke about 4 o'clock in the afternoon, looked in the direction of the house, saw Curt Shelton in the swing, got in his car and left. This statement is corroborated by much of the State's evidence. That Shelton was asleep in the swing is shown by his testimony and also that of Inman. Mrs. Lawson, in relating how she, after becoming intoxicated, left the drinking party in the kitchen and went back below the house and lay down, said "The best I remember Claude (the defendant) had left." Several of the State's witnesses said the defendant's car was parked in the yard that morning. That it was moved, as he claimed, is borne out by the testimony of Inman and Shelton. Each testified that when they discovered the fire and ran out the front of the house the car was not seen in the front yard.

For the purpose of showing presence of the defendant at the house, the State relies in large part on the testimony of Mrs. Vance Jones in which she said she and her husband passed just before the fire and that she "saw a man cross the road and go between the (tobacco) barns. He came straight across the road from the one that goes to the Lawson home."

This testimony is without substantial probative force as tending either to show presence of the defendant at the house or to connect him with an incendiary burning, for these reasons: The witness, Mrs. Jones, said she had no "idea who the man was . . . just happened to glance there and saw him." He was some 300 or 400 feet from the house, crossing a "heavily traveled highway." To infer that the man Mrs. Jones saw was the person who set fire to the house would be at variance with much of the other evidence of the State, and especially with the testimony of Inman. It is noted that when Inman awoke and saw the man in the kitchen "with something in his hands . . . on fire," at that time, according to the testi-

mony of both Inman and Shelton, smoke was pouring "out the eaves of the house," and the fire had reached the point the smoke had changed from white to black. Nevertheless, both Mrs. Jones and her husband said nothing about seeing smoke in the direction of the house just across the road at the time she said she saw the man crossing the road. According to her further testimony and that of her husband, it was some 15 minutes later before they saw any smoke in the direction of the Lawson house. Also, Inman testified (as did Shelton) that when he ran out of the house after discovering the fire, no one was seen leaving the front or back of the house.

Thus, it may not be logically inferred that the man Inman saw in the kitchen with the fire stick was the same man Mrs. Jones saw crossing the highway. The more reasonable inference seems to be that the man Inman saw in the house with the stick of fire is the same man the witness M. M. Gordon said he saw when he first reached the Lawson house (and Gordon and witness Coon were the first to arrive at the scene). Witness Gordon said as he approached the house and turned the corner "a man went through the woods . . . That wasn't in the direction of the road. . . . The man went off toward the back of the house in the opposite direction from where the tobacco barns across the road are." This witness also testified he had previously met on the highway a man in a Ford car going in the other direction (the intended implication being that the man so met was the defendant Needham). Also, Mrs. Jones said the man she saw crossing the road had on a white shirt. The man Gordon saw dash off into the woods "had on a dark colored shirt." Besides, there is no direct evidence in the record indicating that the defendant was ever seen at the house after the drinking party ended earlier that day and after his car was moved from the yard to the tobacco barn.

Nor is the State's case materially bolstered by its line of testimony by which it sought to show that the defendant harbored a design or scheme to burn the Lawson dwelling. The single intimation that the defendant entertained any such thought is found in the testimony of the deceased's wife. She said the defendant was displeased when the family moved to the Johnson place because it was too far—about 20 miles—from his home. "He wanted us to move closer by . . . He said a good way to get us out would be to burn the house. He didn't make any threat,—just spoke about it." This was three or four years before the fire. The record indicates the Lawson family moved at the end of that year and that they moved a second time before going to the Nelson place where the fire occurred. The record reflects nothing thereafter tending to show, or connect the defendant with, any plan or scheme to burn the house. It would seem that this single intimation of a threat, when viewed in its logical setting, has scant evidential value as tending to show that the defendant three

or four years later burned the house at the Nelson place. Ordinarily, "evidence of threats alone is insufficient to prove the identity" of the accused in arson or to justify a conviction. 6 C.J.S., Arson, Sec. 38, p. 764; *S. v. Freeman,* 131 N.C. 725, 42 S.E. 575; *S. v. Rhodes,* 111 N.C. 647, 15 S.E. 1038. See also Wigmore on Evidence, Third Edition, Sec. 102.

As to the evidence tending to show (1) that oil was found in the well at the Nelson place, and (2) that burned chips and paper were found under the kitchen safe at the Carson place, it suffices to say there is no evidence tending in any way to connect the defendant with either of these events. However, treating this evidence as being before the court, as is required on the question of nonsuit (where the rule requires that evidence admitted erroneously over objection must be given full probative effect on the theory that if the inadmissible portions had not been received its proponent may have offered in lieu thereof admissible evidence of equal probative force—*Supply Co. v. Ice Cream Co.,* 232 N.C. 684, 61 S.E. 2d 895; *Ballard v. Ballard,* 230 N.C. 629, 55 S.E. 2d 316), even so, it is without probative force and adds nothing by way of corroboration to the State's case. Nevertheless, we think it appropriate to say that in the absence of proofs tending to connect the defendant with these purely anonymous events, the evidence in respect thereto was inadmissible. Wigmore on Evidence, Third Edition, Sec. 354, p. 263; 22 C.J.S., Criminal Law, Secs. 686 to 690. Also, the evidence that oil was found in the well relates to an event that has no "common features" with the crime of arson. See Wigmore on Evidence, Third Edition, Sec. 304, p. 202.

The evidence of illicit relations between Mrs. Lawson and the defendant was relevant and admissible only on the theory of motive. Motive is not an element of the crime of arson. 6 C.J.S., Arson, Sec. 3, p. 722, and Sec. 38, p. 764. However, the rule is that evidence of motive may be received and considered along with and as corroborative of other evidence tending to show plan or scheme to burn. 6 C.J.S., Arson, Sec. 39, pp. 764 and 765. Therefore, in the absence of other evidence tending to connect the defendant, by fixed plan or otherwise, with an incendiary burning of the Lawson home, the evidence of illicit relations between the defendant and Mrs. Lawson is without probative value of substance as bearing on the charges of arson and murder.

Besides, this record in its over-all implications tends to negative, rather than support, the theory that the illicit relations between these parties furnished a motive for the crimes here charged. The record reflects a marked degree of acquiescence on the part of the deceased. The defendant spent the week-end of the fire with the deceased and his wife, and the record points to complete harmony between them. The three slept together on a pallet at the tobacco barn part of the night before the fire.

The witness Claude Gordon said "Lawson and Needham appeared to be friendly" the day of the fire.

The evidence adduced below, if believed, involves the defendant in a sordid course of conduct and a series of infractions of the criminal laws of this State for which he may yet be tried, and for which, if convicted, the allowable punishment is substantial.

But a careful perusal of the record impels the conclusion that the evidence, when considered either as a series of events or as a composite bundle of circumstances, is insufficient in law to support the convictions for arson and murder. *S. v. Madden, supra; S. v. Jones, supra; S. v. Miller, supra.* It follows, then, that the judgment below will be vacated and reversed and the motions for nonsuit sustained.

Reversed.