STATE OF NORTH CAROLINA v. RICKY GROVES

No. 553A87

(Filed 4 May 1989)

**1. Constitutional Law § 53— delay caused by defendant—no denial of speedy trial**

Defendant was not denied his Sixth Amendment right to a speedy trial by a delay of two years and two months between the issuance of a warrant for defendant's arrest for the murder of the victim and his trial on a first degree murder charge where most of the delay was caused by the granting of thirteen motions for continuances made by defendant, motions for discovery and other motions made by defendant, and problems in securing counsel for defendant; defendant failed to assert his right to a speedy trial until three days before the trial was scheduled to begin, and defendant's actions were inconsistent with a desire for a speedy trial; and defendant made only nonspecific assertions that he was prejudiced by the delay.

**2. Criminal Law § 34.7— threat to kill victim—admissibility**

Evidence that defendant threatened to kill the victim, or to kill a group of which he was a member, approximately two weeks before he killed the victim was relevant and admissible as evidence tending to show premeditation and deliberation and to negate self-defense. N.C.G.S. § 8C-1, Rule 404(b).

**3. Criminal Law § 34.2— other crimes and wrongs—admission as harmless error**

Assuming arguendo that the admission of evidence that defendant set a fire, possessed a knife and made threats to others while in jail awaiting trial for first degree murder violated N.C.G.S. § 8C-1, Rule 404(b), defendant failed to carry his burden under N.C.G.S. § 15A-1443(a) to establish any resulting prejudice by showing a reasonable possibility that a different result would have been reached at trial had the error not been committed.

**4. Homicide § 18.1— first degree murder—premeditation and deliberation—sufficiency of evidence**

Evidence that defendant threatened to kill the victim approximately two weeks before actually killing him, taken together with evidence of the number and nature of wounds the defendant inflicted and the defendant's own statement that he had killed the victim because the victim had stolen marijuana, was substantial evidence of premeditation and deliberation which supported defendant's conviction of first degree murder.

APPEAL by the defendant from judgment and sentence of life imprisonment entered by *Read, J.,* on 9 June 1987, in Superior Court, CUMBERLAND County. The defendant was brought to trial upon a proper bill of indictment charging him with murder and entered a plea of not guilty. The jury having found the defendant guilty of murder in the first degree, a sentencing proceeding was held pursuant to N.C.G.S. § 15A-2000. The jury recommended

that the defendant be sentenced to imprisonment for life, and the trial court entered judgment and sentence in accord with that recommendation. The defendant appealed to the Supreme Court as a matter of right under N.C.G.S. § 7A-27(a). Heard in the Supreme Court on 10 October 1988.

*Lacy H. Thornburg, Attorney General, by G. Patrick Murphy, Assistant Attorney General, for the State.*

*Malcolm Ray Hunter, Jr., Appellate Defender, by Mark D. Montgomery, Assistant Appellate Defender, and Wade Byrd for the defendant-appellant.*

MITCHELL, Justice.

The defendant first contends on appeal that he was denied his right to a speedy trial guaranteed by the Sixth Amendment to the Constitution of the United States. He also contends that the trial court committed reversible error in certain of its evidentiary rulings and by denying his motion to dismiss the charge against him. Finally, the defendant contends that the trial court erred in its instructions to the jury.

Evidence for the State tended to show that in April of 1985, the victim, Danny "Peanut" Williams, lived in a small house on his parents' property in Cumberland County. Ricky Faircloth lived in a house nearby. The victim and Faircloth had entered into an agreement with the defendant, Ricky Groves, whereby the three men were to purchase a pound of marijuana and then sell it for profit.

Faircloth testified that he went to the victim's house at approximately 9:00 p.m. on 8 April 1985. The victim and the defendant were in the victim's house with a man named Dusty and Archie Lee "Oggie" Chavis. The defendant and the victim left to buy a pound of marijuana, and Faircloth returned to his home where he remained until 11:00 p.m. At that time, the victim, Peanut Williams, came to Faircloth's home, and the two of them went to the victim's house. They left the defendant and Oggie in the victim's house at approximately 11:30 p.m. and returned at approximately 2:00 a.m. on the morning of 9 April 1985. When Faircloth and Peanut returned to Peanut's house, the defendant and Oggie were asleep. Peanut said the marijuana was missing. They

woke the defendant and Oggie and searched the house but could not find the marijuana. The victim, the defendant and Faircloth then went to Faircloth's house, where Faircloth gave the victim $450.00 to help pay for the missing pound of marijuana. Thereafter, the defendant and the victim left Faircloth's home together. Faircloth testified that he never again saw the victim alive after that occasion.

Archie Lee "Oggie" Chavis testified that he was in the home of the victim, Peanut Williams, on the evening of 8 April 1985 when Faircloth, Peanut and the defendant left the house saying that they were going to get a pound of marijuana. Oggie remained in the house until the others returned, at which time they all smoked some marijuana. Peanut and Faircloth then left, and Oggie and the defendant went to sleep in Peanut's house.

Oggie testified that he was awakened by the defendant who grabbed him and asked if he knew where the pound of marijuana was. Peanut and Faircloth had returned by that time, and the four men searched the house but failed to locate the marijuana. Faircloth then left the house, and Oggie went back to sleep. Oggie was awakened later when he heard Peanut's voice pleading, "Please don't kill me; don't kill me; don't kill me." Oggie jumped up and observed the defendant coming out of the bedroom with blood dripping from his clothes. The defendant said to Oggie: "Where are you going? You're not going nowhere. I ought to kill you. I don't leave no witnesses around when I do something like this. I ought to go around and kill that Ricky Faircloth boy." While the defendant made these statements, he was holding a knife in one hand and a pistol which he had pulled from his belt in the other hand. He was holding the barrel of the pistol between Oggie's eyes.

Oggie went into the bedroom and saw the victim, Peanut Williams on the floor with his throat cut. The defendant, Ricky Groves, said: "He got me. He got me for my pot." The defendant also said that he had gone to sleep with the marijuana on his stomach and awakened to find Peanut patting him on the stomach. The defendant told Oggie that he had killed the victim because the victim had gotten the marijuana.

Thereafter, the defendant began rummaging through the bedroom and asked Oggie if he "knew where Peanut kept the pot."

Oggie told the defendant that he did not. At that point, the victim "made a grunt" and the defendant kicked him in the head and said, "Shut up, you son of a bitch."

Oggie testified that the defendant later told him that, if anyone asked what had happened, he should say that some black people had killed Peanut. The two then left Peanut's residence. They proceeded to the home of Ronald Lowery, also known as Ronald Hunt, where the defendant gave Oggie a garbage bag and told him to throw it in a dumpster. The two men went to a barn behind Hunt's house where the defendant emptied his pockets, took off his bloody clothes and put them in a garbage bag. The defendant left to take the bag to the nearby dumpster. Oggie testified that the defendant returned and said, "I killed Peanut for nothing." The defendant then "started laughing like it was a joke."

On 9 April 1985, law enforcement officers searched the dumpster and found garbage bags containing clothes and other items. One item bore a fingerprint belonging to the victim, and blood found on some of the items matched the blood type of the victim.

Ronald Lowery, also known as Ronald Hunt, testified that he was asleep on the morning of 9 April 1985, when the defendant came to his house and awakened him by beating on the door. The defendant told Lowery that he had killed the victim, Peanut Williams. Lowery told the defendant to leave his house, and the defendant did so.

Dr. John Butts, a pathologist and the acting Chief Medical Examiner for the State of North Carolina, testified that he performed an autopsy upon the body of the victim, Danny "Peanut" Williams. Dr. Butts testified that the victim died from multiple stab wounds and a cutting or slash wound to the neck. The wound to the neck severed the jugular vein and a branch of the carotid artery, the large artery that supplied blood to the brain. The victim also suffered a cutting injury of the scalp above the right ear. The stab wounds included one wound at the base of the front of the neck and two wounds to the upper right portion of the chest. Additionally, there were nine stab wounds to the victim's back— three on the neck, three more on the right side of the back, two near the center of the back and one in the small of the back. As a

result of the stab wounds, both of the victim's lungs had collapsed and his chest cavity had filled with blood.

Anthony Crosby testified that he shared a cell with the defendant in the Cumberland County Jail while the defendant was awaiting trial on the charge of murdering Peanut Williams. The defendant told Crosby that he was in jail on a murder charge and that he had "butchered" someone named Peanut. The defendant also stated that someone had walked in while Peanut was lying on the floor. Crosby testified that the defendant said that Peanut had made "some kind of noise and he kicked him in the head and told him, said, You son-of-a-bitch, shut up."

Additional evidence was introduced by the State. Some of it is discussed at appropriate points in this opinion where helpful to an understanding of the issues presented.

The defendant testified at trial and stated that he and Peanut Williams were good friends. On 8 April 1985, Peanut Williams, Ricky Faircloth and the defendant discussed buying a pound of marijuana for $900.00 from Ronald Lowery and selling it for $1,200.00 to a buyer known to Peanut and Faircloth. The defendant testified that the men got the marijuana from Ronald Lowery after telling him they would bring him his money in a couple of hours. The men returned to Peanut's house, where the defendant kept the marijuana while Peanut and Faircloth went to locate their buyer.

The defendant testified that while Peanut and Faircloth were gone, he fell asleep with the pound of marijuana lying on his stomach. He awoke to find Peanut feeling around under him and the marijuana gone. The three men went to Faircloth's residence to discuss what they would do about the missing marijuana. While using some cocaine, they decided that Faircloth and Peanut would provide half of the money to pay Ronald Lowery, and the defendant would pay the rest.

The defendant testified that he and Peanut then went back to Peanut's house where they used some more cocaine. The defendant told Peanut that they needed to explain the missing pound of marijuana to Ronald Lowery, and this seemed to make Peanut nervous. Peanut asked the defendant if he thought that

Peanut had gotten the marijuana. The defendant responded that he did not know.

The defendant testified that Peanut then grabbed the handle of the .357 Magnum pistol which the defendant was carrying in the waist of his trousers. He said that as they struggled, he pulled his knife to keep Peanut from getting the gun and cut Peanut across the neck. Peanut's blood ran all over the defendant's face, and the defendant had blood in his eyes. The defendant "got back up on" Peanut and continued to stab him with the knife. The defendant testified: "When I got hold of the pistol, he weren't on me no more; I stopped."

The defendant testified that he left Peanut's house and went to Ronald Lowery's. He told Lowery that the marijuana had been stolen and what had happened to Peanut. Lowery then told the defendant that the marijuana had not been stolen. Lowery said that when Peanut, Faircloth and the defendant had been gone so long the night before, Lowery went to Peanut's house. Discovering the defendant and Oggie asleep, Lowery took the marijuana and left.

[1]   The defendant first contends that he was denied his right to a speedy trial as guaranteed by the Sixth Amendment to the Constitution of the United States. The primary factors to be considered in determining whether this constitutional right has been violated are (1) the length of delay, (2) the reason for the delay, (3) the defendant's assertion of his right to a speedy trial, and (4) prejudice to the defendant resulting from the delay. *Barker v. Wingo*, 407 U.S. 514, 33 L.Ed. 2d 101 (1972); *State v. Lyszaj*, 314 N.C. 256, 333 S.E. 2d 288 (1985). None of these four factors, however, should be viewed as "either a necessary or sufficient condition to the finding of a deprivation of the right of speedy trial. Rather, they are related factors and must be considered together with such other circumstances as may be relevant." *Barker v. Wingo*, 407 U.S. at 533, 33 L.Ed. 2d at 118.

Considering the first factor, length of delay, we note that a period of approximately two years and two months passed between 9 April 1985, when a warrant was issued for the defendant's arrest for the murder of the victim, and the defendant's trial in this case. We previously have stated that "a delay of twenty-two months is not of great significance but is merely the 'trigger-

ing mechanism' that precipitates the [constitutional] speedy trial issue." *State v. Jones,* 310 N.C. 716, 721, 314 S.E. 2d 529, 533 (1984), *citing State v. Hill,* 287 N.C. 207, 214 S.E. 2d 67 (1975). Although the period of delay in the present case was considerable, mere length of delay, standing alone, does not establish that the delay was unreasonable or prejudicial under the Sixth Amendment. *See State v. Kivett,* 321 N.C. 404, 364 S.E. 2d 404 (1988) (427 day delay); *State v. Lyszaj,* 314 N.C. 256, 333 S.E. 2d 288 (three and one-half year delay).

As to the second factor, the reason for the delay, it is apparent that most of the delay in the present case resulted from the granting of motions for continuances made by the defendant. It is in all probability true, as the defendant argues, that some part of the delay in bringing him to trial occurred because the original murder indictment indicating that he would be tried for second-degree murder was dismissed on 27 January 1986, and a new murder indictment indicating that he would be tried for murder in the first degree was returned on the same day. It is also probable that the defendant is correct that the delay in bringing him to trial was occasioned in part by the difficulty in obtaining counsel who could or would represent him and the fact that he was represented by five different attorneys at various times during the period in question.

However, the record reveals that the defendant moved for and was granted thirteen continuances during the period of delay. Additionally, during most of that period, the defendant had numerous motions for discovery and other motions pending before the court. The defendant continued to file pretrial motions in this case as late as the day before the commencement of trial and the day of trial itself. Such facts fully support the trial court's finding in its order denying the defendant's motion to dismiss for denial of his Sixth Amendment right to a speedy trial that: "Most of the delay herein is attributable to the many continuance motions and pre-trial motions filed by defense, as well as the problems stated herein securing counsel for Defendant, his hospitalization, and the discovery process . . . ." As a result, we find no error in the conclusion of the trial court that there "has been no unjustifiable prosecutorial delay" in the present case.

The third factor, the defendant's assertion or failure to assert his right to a speedy trial, must be deemed to weigh against the defendant and in favor of the State. The defendant never indicated in any manner that he wished a speedy trial on the charge against him. To the contrary, the defendant sought and received numerous continuances and filed numerous pretrial motions upon which the trial court was required to rule before trial could commence. Until he filed his motion to dismiss for lack of a speedy trial on 8 May 1987—three days before trial was scheduled to commence on 11 May 1987—the defendant's actions appear to have been inconsistent with a desire for a speedy trial.

As to the fourth factor, prejudice to the defendant from the delay, the defendant presented the trial court with nothing but an affidavit which the trial court deemed "conclusory, self-serving and nonspecific." In denying the defendant's motion to dismiss for lack of a speedy trial, the trial court stated:

> Defendant does not specify how being incarcerated and losing contact with friends and family members and not seeing his children and common law wife has prejudiced him in the trial of this matter or its preparation. He does not specify who he has been unable to talk to and how they could assist him in his defense. The Defendant was given an opportunity to testify at the hearing on this matter, with assurances by the Court to his attorney that the State would be restricted on cross-examination questions and the Defendant declined to do so.

On appeal to this Court, the defendant has made similar nonspecific assertions that he has been prejudiced by delay. He additionally argues that the delay allowed the State to procure four additional witnesses to testify to his statements and actions while incarcerated and awaiting trial.

We do not find the defendant's contentions in this regard persuasive. In summary, we detect no basis for concluding that the defendant was deprived of his right to a speedy trial under the Sixth and Fourteenth Amendments to the Constitution of the United States.

The defendant next contends that the trial court erred in allowing evidence of his other crimes, wrongs, or acts. The defend-

ant argues that the admission of such evidence violated Rule 404(b) of the North Carolina Rules of Evidence.

[2] The defendant first argues in this regard that the testimony of Fonda Whaley violated Rule 404(b). Whaley testified that the defendant was in her home during March of 1985, approximately two weeks before Peanut Williams was killed. Whaley testified that she and her husband came home to discover their daughter Sherry there with Lee Wayne Hunt, Debbie Williford and the defendant, Ricky Groves. They were "doing drugs" and drinking and were not in condition to drive, so the Whaleys allowed them to spend the night. During the evening, they discussed having a cookout the following day. When Lee Wayne Hunt and the defendant awoke the next morning, they left the house. Thereafter, Peanut Williams and Kenny Locklear called and invited Sherry and Debbie to go to the beach with them. The two young women left shortly thereafter with Peanut and Locklear.

Whaley testified that the defendant, Ricky Groves, returned to her house later that afternoon. She further testified as follows:

> Ricky was still—Ricky was—to my opinion, he was still on drugs. He was still doing his drugs or whatever, and he came in with the bag of charcoal and he asked me where Sherry and Debbie were because they were going to cook out, and I told him that Sherry had gone to the beach with Peanut, Danny, and little Kenny Locklear. Ricky got real mad. He had a five pound bag of charcoal and he slung it up on the table, and I told him, I said, Ricky, this shit ain't going to work. I don't have to put up with your shit. Because he was acting real out of control. And I asked him to leave. And he—he had a .357 Magnum in his back pocket. He pulled out that .357 Magnum and told me, standing there, that he would blow their brains out.
>
> . . .
>
> He said he would blow their f—ing brains out.
>
> . . .
>
>     MR. AMMONS: Ma'am, just tell me who y'all had been talking about prior to him making that statement.

THE WITNESS: Peanut and Kenny.

The defendant argues that the admission of Whaley's testimony violated Rule 404(b) because it had no relevance for any purpose other than to prove the character of the defendant in order to show that he acted in conformity therewith at the time he killed Peanut Williams. We do not agree.

As Dean Brandis has pointed out:

> In homicide cases, threats by the accused have always been freely admitted either to identify him as the killer or to disprove accident or justification, or to show premeditation and deliberation. The threats may have been directed specifically toward the deceased, or toward a class of persons of which deceased was a member, or, if there is other evidence tending to connect them with the victim, they may have been of a general nature, and they are not inadmissible merely because they were made a considerable time before the killing or because they were coupled with a condition.

1 Brandis on North Carolina Evidence § 162a (3d ed. 1988) (footnotes omitted). However, evidence of a defendant's threats is insufficient, standing alone, to justify conviction. *State v. Needham*, 235 N.C. 555, 71 S.E. 2d 29 (1952); *State v. Jarrell*, 233 N.C. 741, 65 S.E. 2d 304 (1951).

The enactment of Rule 404 has not changed such rules concerning the admissibility of prior threats against the victim by the defendant. The pertinent part of Rule 404 is as follows:

> (b) *Other crimes, wrongs, or acts.*—Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake, entrapment or accident.

N.C.G.S. § 8C-1, Rule 404(b) (1988).

Since the adoption of the North Carolina Rules of Evidence, Rule 404(b) has been given extensive consideration by this Court. Recently, we pointed out that:

The list of permissible purposes for which such evidence [of other crimes, wrongs, or acts] may be introduced as set forth in the statute *is not exclusive,* and "the fact that evidence cannot be brought within a [listed] category does not necessarily mean that it is inadmissible." *State v. DeLeonardo,* 315 N.C. 762, 770, 340 S.E. 2d 350, 356 (1986). "In fact, as a careful reading of Rule 404(b) clearly shows, evidence of other offenses *is admissible* so long as it is *relevant to any fact or issue* other than the character of the accused." *State v. Weaver,* 318 N.C. 400, 403, 348 S.E. 2d 791, 793 (1986) (quoting 1 *Brandis on North Carolina Evidence* § 91 (2d rev. ed. 1982)) (emphasis added). " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." N.C.G.S. § 8C-1, Rule 401 (1986). Thus, even though evidence may tend to show other crimes, wrongs, or acts by the defendant and his propensity to commit them, it is admissible under Rule 404(b) so long as it also "is relevant for some purpose *other than* to show that defendant has the propensity for the type of conduct for which he is being tried." *State v. Morgan,* 315 N.C. 626, 637, 340 S.E. 2d 84, 91 (1986) (emphasis in original).

*State v. Bagley,* 321 N.C. 201, 206-207, 362 S.E. 2d 244, 247 (1987).

Evidence that approximately two weeks before he killed Peanut Williams the defendant threatened to kill him, or to kill a group of which he was a member, was relevant and admissible as evidence tending to show premeditation and deliberation and to negate self-defense. *See* 1 Brandis on North Carolina Evidence § 162a (3d ed. 1988) and cases cited therein. Therefore, in addition to its tendency to show the defendant's propensity to commit the crime charged, this evidence was *also* relevant for a proper purpose. As a result, it was not excludable under Rule 404(b). *State v. Bagley,* 321 N.C. at 206, 362 S.E. 2d at 247; *State v. Weaver,* 318 N.C. at 403, 348 S.E. 2d at 793; *State v. DeLeonardo,* 315 N.C. at 770, 340 S.E. 2d at 356; *State v. Morgan,* 315 N.C. at 637, 340 S.E. 2d at 91. The trial court did not err in admitting Whaley's testimony in this regard.

[3]  The defendant also argues that the trial court violated Rule 404(b) by allowing the introduction of evidence tending to show that he started a fire in jail while he was incarcerated awaiting trial on the charge of murder and that a "shank" or homemade knife similar to an ice pick with a blade approximately four inches in length was found among his belongings in the jail. The defendant additionally argues that the trial court erred in allowing testimony that he had threatened a guard in the jail and said that he had killed one person and would kill another. The State argues, on the other hand, that such evidence was relevant to explain why the witness Anthony Crosby waited for two weeks to tell the authorities that, while the two men were incarcerated together, the defendant told Crosby he had "butchered" Peanut Williams and explained some of the details.

It is true that during the cross-examination of Crosby, the defendant attempted to discredit him by casting doubt upon his reasons for bringing such information to the attention of authorities. However, we find it unnecessary to decide whether evidence of the knife, the fire in the jail or the defendant's threats to others while incarcerated violated Rule 404(b). Assuming *arguendo* that such evidence was improperly admitted in the present case, we conclude that the defendant has failed to carry his burden under N.C.G.S. § 15A-1443(a) to establish any resulting prejudice by showing a reasonable possibility that a different result would have been reached at trial had the error not been committed.

The evidence the State offered in attempting to prove the defendant's threats to kill others was in the form of Crosby's testimony to such events. In light of the fact that Crosby had already testified that the defendant had admitted "butchering" Peanut Williams it is doubtful that such testimony concerning later threats was given much weight at all by the jury.

The evidence concerning the defendant's alleged setting of the fire in the jail also consisted of testimony by Crosby to that effect. The defendant rebutted this evidence by the testimony of Phillip Locklear, another inmate who testified that Crosby himself set the fire. The defendant also introduced the testimony of James R. Nance, Jr., Locklear's attorney, who testified that he represented both Locklear and the defendant in the fire incident and that Locklear had told him that Crosby started the fire.

The evidence that the defendant had a knife in jail consisted of the testimony of Crosby to that effect and the testimony of Chief Jailer Daniel Ford concerning "field notes" made by jail personnel indicating that a knife was found among the defendant's belongings. Further, a knife purported to be the one found was displayed to the jury. However, nothing in the evidence tended to indicate that, if the defendant in fact possessed the knife, he ever used it or attempted to use it in any improper or unlawful way.

Even assuming *arguendo* that the foregoing evidence was improperly admitted in violation of Rule 404(b), the defendant has failed to show that it affected the jury's verdict in light of the evidence properly admitted. The State had already introduced evidence that the defendant cut the victim's throat and stabbed him more than a dozen times causing both of his lungs to collapse and his chest cavity to fill with blood. The defendant conceded these facts during his own testimony at trial. Additionally, the State introduced evidence of the defendant's own statement to Archie Lee "Oggie" Chavis shortly after the killing that the defendant had killed the victim because the victim had gotten the marijuana. In light of such evidence for the State, we conclude that the defendant has failed to show a reasonable possibility that, but for the admission of evidence that he set a fire and possessed a knife in jail and made threats while in jail, a different result would have been reached at trial. The defendant has failed to carry his burden of showing prejudice resulting from any possible violation of Rule 404(b).

[4] The defendant next contends that the trial court erred by denying his motion to dismiss the first-degree murder charge against him at the close of all evidence. The defendant argues that there was no substantial evidence tending to show that he killed Peanut Williams with premeditation and deliberation.

The rules for testing the sufficiency of the evidence to overcome a motion to dismiss in a criminal case have been stated in detail in numerous decisions of this Court. *E.g., State v. Mercer,* 317 N.C. 87, 343 S.E. 2d 885 (1986); *State v. Lowery,* 309 N.C. 763, 309 S.E. 2d 232 (1983); *State v. Earnhardt,* 307 N.C. 62, 296 S.E. 2d 649 (1982); *State v. Powell,* 299 N.C. 95, 261 S.E. 2d 114 (1980). It would serve no useful purpose to recite those rules again in

detail here. Instead, it suffices for purposes of this case to point out that in considering a motion to dismiss the evidence must be considered in the light most favorable to the State with every reasonable intendment and inference drawn in favor of the State. *Id.* Here, the evidence that the defendant threatened to kill the victim approximately two weeks before actually killing him, taken together with the evidence of the number and nature of wounds the defendant inflicted and the defendant's own statement that he had killed the victim because the victim had gotten the marijuana, was substantial evidence of premeditation and deliberation. It was more than sufficient to withstand the defendant's motion to dismiss.

Finally, the defendant contends that the trial court erred in failing to give an instruction he purportedly requested. We conclude that the instructions given by the trial court included the substance of the purportedly requested instruction and were without error. The defendant was entitled to no more, since a trial court is not required to give requested instructions verbatim, even when they are correct statements of law. *State v. Allen,* 322 N.C. 176, 367 S.E. 2d 626 (1988).

For the foregoing reasons, we hold that the defendant received a fair trial free of reversible error.

No error.